**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SOUTHERN EDUCATION FOUNDATION, | |
| *Plaintiff*, | |
| v. | Case No.1:25-cv-01079-PLF |
| UNITED STATES DEPARTMENT OF EDUCATION, *et al.*, | |
| *Defendants*. | |

**PLAINTIFF SOUTHERN EDUCATION FOUNDATION'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR <u>PRELIMINARY INJUNCTION/TEMPORARY RESTRAINING ORDER</u>**

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................... 1

STATEMENT OF FACTS ....................................................................................................... 1

    I.    Overview of Southern Education Foundation and Its Work ....................................... 1

    II.    The EAC Grant Award to SEF in FY2022 ................................................................ 2

    III.    The Department of Education's Termination of the EAC Grant ................................ 2

    IV.    Effects of Grant Termination on SEF and Education Agencies ................................. 2

LEGAL AND REGULATORY FRAMEWORK ...................................................................... 3

    I.    The History of Desegregation Assistance Centers .................................................... 3

    II.    EAC Grant Program and Department Priorities ....................................................... 3

    III.    Legal Requirements for Federal Grant Management .................................................. 4

    IV.    Legal Standards for Grant Termination .................................................................... 5

LEGAL STANDARD .............................................................................................................. 5

ARGUMENT ........................................................................................................................... 7

    I.    Plaintiff is Likely to Succeed on the Merits .............................................................. 7

        A.    Plaintiff is Likely to Succeed on the Merits of its Administrative Procedure Act Claims (First, Second, and Third Causes of Action) ................................................................ 7

        *B.*    Plaintiff is Likely to Succeed on the Merits of its *Civil Rights Act* Claim *(Fifth Cause of Action)* ................................................................................................................ 13

        *C.*    Plaintiff is Likely to Succeed on the Merits of its *Constitutional Claims* (Fourth, Sixth, and Seventh Causes of Action) ................................................................................ 16

    II.    Plaintiff Will Suffer Irreparable Harm Without an Injunction ................................ 29

        A.    Immediate Existential Financial and Operational Harms ........................................ 29

        B.    Irreparable Harm to SEF's Reputation and Relationships ...................................... 30

        C.    Irreparable Harm to Educational Agencies and Students Served ............................. 30

        D.    Irreparable Harm to SEF's First Amendment Rights ............................................. 32

    III.    The Balance of Equities Favors Plaintiff ................................................................ 32

    IV.    Plaintiff Will Suffer Substantial Harm if the Injunction is Denied ......................... 32

    V.    An Injunction Will Serve the Public Interest .......................................................... 34

        A.    Public Interest in Proper Administrative Procedures ............................................... 34

        B.    Public Interest in Desegregated Education .............................................................. 36

    VI.    No Bond Should Be Required .................................................................................. 37

CONCLUSION ...................................................................................................................... 37

## TABLE OF AUTHORITIES

**Cases**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013) ...... 22, 25, 26, 27, 28

*Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*, --- F. Supp. 3d ----, 2025 WL 833917 (D. Md. Mar. 17, 2025) ................................................................................................................. 4, 10, 16

*Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94 (1902) ............................................. 18

*Ascension Borgess Hosp. v. Becerra*, 557 F. Supp. 3d 122 (D.D.C. 2021) ................................. 18

*Brown v. Board of Education,* 347 U.S. 483 (1954) .................................................. 1, 3, 21, 30, 36

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156 (1962) ............................................. 8

*Burson v. Freeman*, 504 U. S. 191 (1992) .......................................................................... 28, 29

*Chamber of Com. v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996) ......................................................... 18

*Changji Esquel Textile Co. Ltd. v. Raimondo*, 40 F.4th 716 (D.C. Cir. 2022) .............................. 6

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006) ........................ 5

*Clinton v. City of New York*, 524 US 417 (1998) ......................................................................... 4

Consol. Edison Co. v. Pub. Serv. Comm'n, 447 U.S. 530 (1980) ............................................... 26

*D.A.M. v. Barr*, 474 F. Supp. 3d 45 (D.D.C. 2020) ...................................................................... 6

*Darby v. Cisneros*, 509 U.S. 137 (1993) ............................................................................. 19, 20

*Dep't of Commerce v. New York*, 588 U.S. 752 (2019) ................................................................ 8

*Dept. of Homeland Sec. v. Regents of the Univ. of California*, 591 US 1 (2020) ......................... 9

*Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46 (2015) ........................................................ 10

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016) ........................................................... 9

*Experience Works, Inc. v. Chao*, 267 F.Supp. 2d 93 (D.D.C. 2003) ............................................ 6

*Fed. Express Corp. v. United States DOC*, 39 F.4th 756 (D.C. Cir. 2022) ................................. 17

*Fox v. Clinton*, 684 F.3d 67 (D.C. Cir. 2012). ........................................................................... 10

*Genuine Parts Co. v. EPA*, 890 F3d 304 (2018) .......................................................................... 7

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ............................................................... 16, 24

*Hall v. Johnson*, 559 F. Supp. 2d 1 (D.D.C. 2009) ...................................................................... 6

Hill v. Colorado, 530 U.S. 703 (2000) ....................................................................................... 25

*Htet v. Trump*, 2025 U.S. Dist. LEXIS 28561 (D.D.C. Feb. 18, 2025) ....................................... 17

*Jacksonville Port Auth. v. Adams*, 556 F.2d 52 (D.C. Cir. 1977) ............................................... 35

*Jifry v. FAA*, 370 F.3d 1174 (D.C. Cir. 2004).................................................................. 11

*Keyishian v. Bd. of Regents*, 385 U.S. 589 (1967)......................................................... 24

*Legal Services Corporation* v. *Velazquez*, 531 U.S. 533 (2001) ................................... 22

*Lewis v. United States Parole Comm'n*, 743 F. Supp. 3d 181 (2024) .......................... 17

*Margallo-Gans v. United States Citizenship & Immigration Servs.*, 2024 U.S. Dist. LEXIS 49604 (D.D.C. Mar. 20, 2024)........................................................................................... 19

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ........... 8, 10, 16

*NAACP v. Button*, 371 U.S. 415 (1963)..................................................................... 24, 25

*Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 26 F.4th 960 (D.C. Cir. 2022)......... 17, 18

*Nat'l Lifeline Ass'n. v. FCC*, 921 F3d 1102 (2019) ......................................................... 9

*Nealy v. Emmert*, No. 20-cv-03820-ZMF, 2025 U.S. Dist. LEXIS 53191 (D.D.C. Mar. 20, 2025) .................................................................................................................................... 7

*Nken v. Holder*, 556 U.S. 418 (2009) ............................................................................. 6

*PFLAG v. Trump,* 2025 U.S. Dist. LEXIS 26702 (D. Md. Feb. 14, 2025) ..................... 20

*Police Dep't of Chicago v. Mosley*, 408 U.S. 92 (1972) .............................................. 26

*Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500 (D.C. Cir. 2016).......................... 6, 32

*RAV v. City of St. Paul*, 505 U.S. 377 (1992) .......................................................... 28, 29

Reed v. Town of Gilbert, 576 U.S. 155 (2015)................................................................ 25

*Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14 (2020)................................ 32

*Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819 (1995)............... 26

*Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47 (2006)....................... 22

*Rust v. Sullivan*, 500 U.S. 173 (1991) ......................................................................... 25

*Salazar v. Ramah Navajo Chapter*, 567 U.S. 182 (2012)....................................... 35, 36

*Sherley v. Sebelius*, 644 F.3d 388 (D.C. Cir. 2011) ...................................................... 6

*Texas Low Income Housing Information Service v. Carson*, 427 F. Supp. 3d 43 (D.D.C. 2019) 14, 15

*United States v. Williams*, 553 U.S. 285 (2008) ......................................................... 16

*United States v. Winstar Corp.*, 518 U.S. 839 (1996)................................................... 35

*Vidal v. Elster*, 602 U.S. 286 (2024)........................................................................... 27

*Washington Legal Found. v. Alexander*, 984 F.2d 483, 484 (D.C. Cir. 1993) ............... 14

*Wilhelm v. Caldera*, 90 F. Supp. 2d 3 (D.D.C. 2000)................................................. 19

## Statutes

20 U.S.C. § 1234c ................................................................................................ 8, 9, 16

20 U.S.C. § 1234d ........................................................................................ 7, 8, 16, 17

20 U.S.C. § 1234i ................................................................................................... 8

20 U.S.C. § 3402 ............................................................................................... 7, 23

20 U.S.C. § 3411 ............................................................................................... 7, 23

20 USC § 1234g ................................................................................................... 22

34 C.F.R. § 100.7 ................................................................................................ 17

42 U.S.C. § 2000c ................................................................................................. 4

42 U.S.C. § 2000c-2 .............................................................................................. 4

42 U.S.C. § 2000d-1 ................................................................................... 17, 18, 19

5 U.S.C. § 553 ...................................................................................................... 7

5 U.S.C. § 702 .................................................................................................... 22

## Other Authorities

81 F.R. 46808 ...................................................................................................... 5

81 F.R. 46817-46819 ............................................................................................. 6

84 F.R. 65300 .................................................................................................... 15

84 F.R. 65300-65303 ............................................................................................. 6

85 F.R. 13640 .................................................................................................... 15

85 F.R. 13640-13644 ............................................................................................. 6

86 F.R. 70612-70641 ............................................................................................. 6

87 F.R. 8564 ..................................................................................................... 15

87 F.R. 8564-8570 ................................................................................................ 6

87 F.R. 8566 ...................................................................................................... 7

87 F.R. 8567 ...................................................................................................... 7

*Brown v. Bd. of Educ. of Topeka, Kan.*, 349 U.S. 294 (1955) ...................................... 25

Exec. Order No. 14,151, 90 Fed. Reg. 8339 (Jan. 29, 2025) ........................................ 24

Exec. Order No. 14,173, 90 Fed. Reg. 8633 (Jan. 31, 2025) ........................................ 24

*Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools,* 1 Supp. Op. O.L.C. 303, 309 (1969) (Rehnquist, A.A.G.) ......................... 24

U.S. Const. art. I, § 8...................................................................................................8

U.S. Const. art. II, §§ 1-3...........................................................................................8

**Regulations**

2 C.F.R. 200.340.........................................................................................................9

2 C.F.R. Part 200........................................................................................................8

24 C.F.R. § 1.8..........................................................................................................18

34 C.F.R. § 100.8......................................................................................................17

34 C.F.R. § 270.6........................................................................................................8

34 C.F.R. § 75.105................................................................................................6, 15

34 C.F.R. § 75.253....................................................................................................16

34 C.F.R. 81.3.............................................................................................................8

34 C.F.R. Part 270.......................................................................................................5

34 C.F.R. Part 81.....................................................................................................7, 8

## INTRODUCTION

The Southern Education Foundation, a nonprofit with a 158-year history of advancing educational equity, was awarded a federal grant in 2022 to operate EAC-South to address desegregation and civil rights compliance in Region II. SEF challenges the Department of Education's decision to terminate grant PR/Award Number S004D220011 and asks the Court for immediate and temporary injunctive relief during the pendency of this action.

Without this relief, SEF will continue to suffer irreparable harm from the grant termination announced and implemented on February 13, 2025 via termination letter (the "Termination Letter"). The Court should grant the requested injunction because SEF is likely to succeed on the merits, defendants would face minimal harm, and the public interest would be served through SEF's continued desegregation efforts.

## STATEMENT OF FACTS

### I.    Overview of Southern Education Foundation and Its Work

For 158 years, SEF has advanced equitable education policies across the Southern United States[1], including supporting Thurgood Marshall's legal team in *Brown v. Board of Education,* 347 U.S. 483 (1954) (*Brown I*).[2] SEF operates several programs[3], most notably the federally-granted Equity Assistance Center-South ("EAC-South"), which addresses educational disparities based on race, national origin, sex, and religion.

SEF's expertise in desegregation uniquely qualified it to operate EAC-South for Region II (Alabama, Arkansas, Florida, Georgia, Louisiana, Mississippi, North Carolina, South Carolina,

---

[1] S. Educ. Found., Who We Are, https://southerneducation.org/who-we-are/ (last visited Apr. 17, 2025).
[2] Raymond C. Pierce, The Southern Education Foundation's Legacy with Brown v. Board of Education, POVERTY & RACE, Jan.-Apr. 2024, https://www.prrac.org/the-southern-education-foundations-legacy-with-brown-v-board-of-education-january-april-2024-p-r-article/.
[3] S. Educ. Found., What We Do, https://southerneducation.org/what-we-do/ (last visited Apr. 17, 2025).

1

Tennessee, Texas, Virginia, and the District of Columbia), which contains 98% (130 of 132) of remaining open federal school desegregation cases. (*See* Collins Supp. Aff. Ex. 2).

## II.    The EAC Grant Award to SEF in FY2022

In FY2022, the Department of Education (the "Department") awarded SEF a five-year discretionary grant (PR/Award Number S004D220011) under Title IV of the Civil Rights Act of 1964 to operate the Region II Equity Assistance Center. The grant was structured as a cooperative agreement under Education Department General Administrative Regulations ("EDGAR") with substantial Department involvement. SEF was selected for its unique expertise and historical commitment to desegregation in Region II, which has the highest concentration of open federal desegregation cases nationally. During implementation, SEF met all performance benchmarks, executing twenty-two technical assistance projects with measurable impacts on student outcomes and desegregation compliance. Nine additional requests were pending at termination. Collins Supp. Aff. at 3, 6.

## III.    The Department of Education's Termination of the EAC-South Grant

The Department abruptly terminated SEF's grant on February 13, 2025, claiming it supported initiatives that "unlawfully discriminate" and failed to prioritize "merit, fairness, and excellence in education." Compl. Ex. D at 1. This termination was immediate, without prior notice of deficiencies or opportunity to respond.

## IV.    Effects of Grant Termination on SEF and Education Agencies

The termination disrupted SEF's ongoing desegregation work and left $78,960.83 in outstanding payments and $214,720.95 in unreimbursed expenses. Collins Supp. Aff. Ex. 1 at 2. Without EAC-South's assistance, the 130 districts with open desegregation orders face increased risk of noncompliance with court orders and federal civil rights mandates, thus jeopardizing hard-earned progress toward resolving educational disparities contrary to Title IV.

2

## LEGAL AND REGULATORY FRAMEWORK

### I.    The History of Desegregation Assistance Centers

Title IV of the Civil Rights Act of 1964 was enacted to implement the Supreme Court's ruling in *Brown v. Board of Education*, which declared racially segregated public schools unconstitutional. 347 U.S. 483 (1954). Under 42 U.S.C. § 2000c-2, the Secretary is authorized to provide technical assistance to school districts implementing desegregation plans, including information and personnel to address special educational challenges arising from desegregation.

Recognizing that *Brown* alone was insufficient to achieve desegregation, Congress established Title IV to advance these efforts and facilitate compliance with the Fourteenth Amendment's Equal Protection Clause. The Secretary established Desegregation Assistance Centers (renamed Equity Assistance Centers in 2016) to provide technical assistance to school districts across defined geographic regions. *See* 34 CFR Part 270; 81 FR 46808.

Today, EACs remain the only federally authorized entities providing expert assistance to districts regarding civil rights compliance, desegregation, and equitable educational practices. As the Supreme Court said in *Green v. County School Board*, school districts have an affirmative duty to eliminate racial discrimination in schools "root and branch." 391 U.S. 430, 438 (1968).

### II.    EAC Grant Program and Department Priorities

Department of Education priorities for discretionary grants must be published in the Federal Register after public notice and comment ("Priorities"). 34 C.F.R. § 75.105. Following this process, the Department established Priorities for EACs in 2016, including "a track record of success or demonstrated expertise in developing or providing technical assistance to increase socioeconomic diversity in schools or school districts as a means to further desegregation by race, sex, national origin, and religion." 81 F.R. 46817-46819. Additional Priorities were

published in 2019 (84 F.R. 65300-65303), 2020 (85 F.R. 13640-13644), and 2021 (86 F.R. 70612-70641).

The Department published a Notice inviting Applications for the FY2022 EAC competition for five-year grants, including a Priority for "Promoting Equity Through Diverse Partnerships." 87 F.R. 8567; 87 F.R. 8566.

## III.    Legal Requirements for Federal Grant Management

Unlike most federal agencies, the Department of Education faces unique statutory requirements for establishing priorities for discretionary grants. While the Administrative Procedure Act (APA) generally exempts discretionary grants from rulemaking (5 U.S.C. § 553(a)(2)), the General Educations Provisions Act (GEPA) creates a special rule for the Department. Under 20 U.S.C. § 1234d and 34 C.F.R. Part 81, the Department must follow notice-and-comment rulemaking for priorities except in two limited circumstances not presently applicable.

This means that priorities for Department discretionary grants must undergo public comment. *See* 20 U.S.C. § 1232(d); *Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*, -- F. Supp. 3d --, 2025 WL 833917, at *21 (D. Md. Mar. 17, 2025). Congress established the Department to "ensure that education issues receive proper treatment at the Federal level" (20 U.S.C. § 3402) and granted the Secretary authority to supervise it (20 U.S.C. § 3411). The U.S. Constitution does not authorize the President to terminate congressionally created grants. *See Clinton v. City of New York*, 524 US 417, 438 (1998) (clarifying that "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes"); U.S. Const. art. I, § 8; U.S. Const. art. II, §§ 1-3.

4

## IV.    Legal Standards for Grant Termination

GEPA's enforcement provisions govern termination of EAC grants during a budget period. *See* 20 U.S.C. § 1234d; 34 C.F.R. Part 81. EACs are an "applicable program" under GEPA (20 U.S.C. § 1234i; 34 C.F.R. Part 81; 34 C.F.R. § 270.6), which require the Department to follow specific GEPA procedures when terminating grants. The Department cannot bypass these protections by applying alternative procedures from 2 C.F.R. Part 200.

Under GEPA, funds may be withheld only when a grantee "is failing to comply substantially with any requirement of law applicable to such funds." 20 U.S.C. § 1234c(a); 34 C.F.R. 81.3. The termination process requires written notice specifying "(1) the intent to withhold payments; (2) the factual and legal basis for the Secretary's belief that the [grantee] has failed to comply substantially with a requirement of law; and (3) an opportunity for a hearing to be held on a date at least 30 days after the notification has been sent to the [grantee]." 20 U.S.C. § 1234d(b); 34 C.F.R. 81.

GEPA permits mid-budget period termination only as a remedy for substantial noncompliance with applicable law. *See* 20 U.S.C. § 1234d(d). The Department cannot arbitrarily and immediately bypass these statutory requirements in this case simply because a grant no longer aligns with the administration's priorities.

## LEGAL STANDARD

To obtain a preliminary injunction in the D.C. Circuit, the movant must establish "(1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (citations omitted). When the movant seeks to enjoin the government, the final two factors are combined. *See Pursuing Am.'s*

*Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009) (holding that "in the context of a stay, assessing the harm to the opposing party and weighing the public interest merge when the Government is the opposing party.")).

Courts in this Circuit continue to apply a "sliding scale" approach, wherein "a strong showing on one factor could make up for a weaker showing on another." *Changji Esquel Textile Co. Ltd. v. Raimondo*, 40 F.4th 716, 726 (D.C. Cir. 2022) (internal quotation marks and citation omitted) (noting potential tension in case law but reserving the question of "whether the sliding-scale approach remains valid"). Furthermore, the D.C. Circuit has emphasized that preliminary injunctive relief remains "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter*, 555 U.S. at 22).

"The same standards apply for both temporary restraining orders and preliminary injunctions." *Experience Works, Inc. v. Chao*, 267 F.Supp. 2d 93, 96 (D.D.C. 2003); *see also Hall v. Johnson*, 559 F. Supp. 2d 1, 3 n.2 (D.D.C. 2009) (citing *Experience Works, Inc.*). Courts thus apply the same four-factor test and sliding scale approach when evaluating TRO motions, with the final two factors combined when the government is the party to be enjoined. *See D.A.M. v. Barr*, 474 F. Supp. 3d 45, 67 (D.D.C. 2020) (applying the four-factor test and noting that "[w]hen the movant seeks to enjoin the government, the final two TRO factors—balancing the equities and the public interest—merge").

## ARGUMENT

**I.    Plaintiff is Likely to Succeed on the Merits**

### A.  Plaintiff is Likely to Succeed on the Merits of its Administrative Procedure Act Claims (First, Second, and Third Causes of Action)

#### 1.  *The Department's Termination was Arbitrary and Capricious (First Cause of Action)*

Plaintiff is likely to succeed on the merits of the first claim because the Department's decision to terminate the federal grant awarded to Plaintiff fell below the Administrative Procedure Act's ("APA") standards for reasoned decision-making. In general, an agency's action is arbitrary and capricious if the agency (1) "has relied on factors which Congress has not intended it to consider," (2) "entirely failed to consider an important aspect of the problem," (3) "offered an explanation for its decision that runs counter to the evidence before it," or (4) makes a decision "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Nealy v. Emmert*, No. 20-cv-03820-ZMF, 2025 U.S. Dist. LEXIS 53191, at *10-11 (D.D.C. Mar. 20, 2025); *see Genuine Parts Co. v. EPA*, 435 US App DC 338, 346, 890 F3d 304, 312 (2018) (stating that "[a]n agency action is arbitrary and capricious when, inter alia, the agency has "entirely failed to consider an important aspect of the problem [or] offered an explanation for its decision that runs counter to the evidence before the agency").

The Department's termination of SEF's grant was arbitrary and capricious for several reasons. First, the Department failed to consider important aspects of the problems for which SEF was awarded the grant to help remedy on behalf of Congress. The termination letter made no reference to the one hundred thirty active federal desegregation orders in Region II that SEF was specifically funded to address. An agency must "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor*

*Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

Second, the Department's explanation runs counter to the evidence before it. The

Termination Letter vaguely alleged that SEF promotes "diversity, equity, and inclusion" ("DEI")

initiatives that "unlawfully discriminate," but provided no specific instances of such

discrimination. The record shows that SEF was selected in 2022 specifically because its

application advanced the Department's duly established Priorities. The Department presented no

evidence that SEF's performance deviated from its approved grant application or that its

activities violated any civil rights law. *See Dep't of Commerce v. New York*, 588 U.S. 752, 783

(2019) (finding agency action arbitrary when explanation contradicted evidence in the record).

As the Supreme Court emphasized in that case, "the reasoned explanation requirement of

administrative law . . . is meant to ensure that agencies offer genuine justifications for important

decisions, reasons that can be scrutinized by courts and the interested public. Accepting

contrived reasons would defeat the purpose of the enterprise." *Id*. at 783–85. The Court further

noted that judges "cannot ignore the disconnect between the decision made and the explanation

given" and are "not required to exhibit a naiveté from which ordinary citizens are free." *Id*. at

785 (internal quotation marks omitted).

Third, the Department failed to acknowledge the significance of its change in policy

position. When an agency changes policy, it must:

> [A]cknowledge it is changing its policy and show that there are good reasons for
> the new policy and that the agency believes it to be better, which the conscious
> change of course adequately indicates. An agency cannot ignore its prior factual
> findings that contradict its new policy nor ignore reliance interests. A reasoned
> explanation is needed for disregarding facts and circumstances that underlay or
> were engendered by the prior policy. This court has thus understood its role to be
> confined to ensuring that the agency engaged in reasoned decision making after a

searching and careful inquiry of the record. The agency's substantive decision must be supported by substantial evidence in the administrative record.

*Nat'l Lifeline Ass'n. v. FCC*, 440 US App DC 318, 921 F3d 1102 (2019) (cleaned up).

Here, the Department reversed its position on what had previously been Priorities set after notice and comment rulemaking without acknowledging the reversal or explaining why terminating not only SEF's grant, but the entire EAC-South grant program, better serves the statutory purpose of Title IV. This reversal directly contravenes the requirements in *National Lifeline*. The Department failed to formally change its previously established policy priorities, which had been formalized through proper administrative procedures with public input. More critically, the administrative record is devoid of any "good reasons" (*Id.*) for this new policy direction or any substantive explanation of why the Department believes this termination better advances Title IV's objectives. *See Dept. of Homeland Sec. v. Regents of the Univ. of California*, 591 US 1 (2020) (holding that agencies must "provide a reasoned explanation for [their] action" that includes "a rational connection between the facts found and the choice made").

The Department also neglected to address its prior findings that supported the original grant program's creation and implementation—findings that contradict its current position. Furthermore, the Department has entirely disregarded the substantial reliance interests of both SEF, other grantees, and the hundreds of school districts who rely on EAC-South's services because they have structured their operations and financial planning around the continued existence of these properly established grant programs. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) (holding that agencies must consider reliance interests in policy changes). The absence of a "reasoned explanation" for disregarding these circumstances and prior factual determinations renders the Department's action precisely the kind of arbitrary decision-making that *National Lifeline* prohibits. The record demonstrates the Department did

9

not, and has not, engaged in the "searching and careful inquiry" required before the Department can implement such a significant policy reversal. *Fox v. Clinton*, 684 F.3d 67, 75 (D.C. Cir. 2012).

Finally, the use of a template termination letter that is substantively, if not entirely, identical to those sent to other EACs and grant recipients demonstrates that the Department did not conduct an individualized assessment of SEF's grant. The Department has not provided a satisfactory explanation of the facts found or the choice made, much less a rational connection between the two. The Termination Letter fails to mention or refer to data or information the Department considered, if any, in deciding that the Grant Programs no longer effectuate Department Priorities. Further, "the Department's use of a template or boilerplate letter issued to all Grant Recipients further strengthens Plaintiff's argument that the Department did not consider individual, or any, data or information." *Am. Ass'n of Colls. For Tchr. Educ. v. McMahon*, 2025 U.S. Dist. LEXIS 48368 (D. Md. Mar. 17, 2025, No. 1:25-cv-00702-JRR) (cleaned up). Other courts have reached similar conclusions regarding similar terminations, finding the same Termination Letter "does not reach the level of a reasoned explanation; indeed it amounts to no explanation at all." *Id*. The Department's failure to distinguish between SEF's court-ordered desegregation assistance and what it vaguely termed "DEI initiatives" underscores the arbitrary nature of the termination. "Agencies do not have free rein to use inaccurate data. An agency is required to 'examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Dist. Hosp. Partners, L.P. v. Burwell*, 415 US App DC 203, 213-214, 786 F3d 46, 56-57 (2015) (quoting *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43).

2.   *The Department Failed to Comply with Notice-and-Comment Rulemaking*
     *(Second Cause of Action)*

Plaintiff is likely to succeed on its second claim because the Department did not follow

the notice-and-comment rulemaking procedure to change Priorities applicable to the EAC-South

grant. The APA's rulemaking provisions generally require that notice of proposed rules be

published in the Federal Register and that "interested persons" be given the "opportunity to

participate in the rule making through submission of written data, views, or arguments." 5 U.S.C.

§ 553(b), (c). The statute permits agencies to dispense with the notice-and-comment procedure

"when the agency for good cause finds (and incorporates the finding and a brief statement of

reasons therefor in the rules issued)" that the procedure is "impracticable, unnecessary, or

contrary to the public interest." 5 U.S.C. § 553(b)(3)(B); *see also Jifry v. FAA*, 361 U.S. App.

D.C. 450, 370 F.3d 1174, 1178 (D.C. Cir. 2004) (finding that the good cause exception applied

since the notice and comment procedures would pose a threat to TSA and FAA operations).

The Department's termination of SEF's grant based on newly imposed Priorities violates

mandatory notice-and-comment rulemaking procedures for three reasons. First, the Department's

new anti-DEI priorities cited as justification for terminating SEF's grant represented a substantial

change to existing program Priorities that was never subject to requisite notice-and-comment

rulemaking. Under 34 C.F.R. § 75.105(b)(2), the Secretary must establish Priorities through

these rulemaking procedures. The Priorities applicable to SEF's grant were lawfully established

through Federal Register notices in 2019 (84 F.R. 65300), 2020 (85 F.R. 13640), 2021 (86 F.R.

70612), and specifically for the EAC program in 2022 (87 F.R. 8564). These Priorities

emphasized "promoting equity in student access to educational resources and opportunities"—

directly contrary to the newly asserted priority of prohibiting "DEI initiatives."

11

Second, GEPA's stringent rulemaking requirements apply to this grant program. Unlike most federal agencies governed only by the APA, the Department is subject to heightened procedural requirements under 20 U.S.C. § 1232(d). This provision cancels out the usual APA exemption for grants unless the regulation "governs the first grant competition under a new or substantially revised program authority" or conducting rulemaking would impose "extreme hardship on the intended beneficiaries." 20 U.S.C. § 1232(d)(2). Neither exception applies here, as EACs have been authorized continuously since the Civil Rights Act of 1964 became law.

Finally, the Department's assertion of an entirely new priority—ensuring grants "do not support programs or organizations that promote or take part in diversity, equity, and inclusion initiatives"—constitutes a substantive rule change that requires formal rulemaking. This was not a minor procedural adjustment, but a fundamental redefinition of the program's Priorities that affects grantee rights and obligations, as well as the reliance interests of the school districts and educators who depend on EACs. The Department's failure to publish this proposed change in the Federal Register, solicit public comment, or consider stakeholder input before applying it to terminate existing grants violates both the letter and spirit of GEPA's rulemaking requirements.

3.  *The Department Failed to Comply with Due Process (Third Cause of Action)*

Plaintiff is likely to succeed on its third claim because the Department's termination of SEF's grant flagrantly violates mandatory due process procedures specified in GEPA.

First, the Department incorrectly invoked continuation grant procedures when termination procedures were required. The Department cited 34 C.F.R. § 75.253 in its termination letter, which governs continuation awards for multi-year grants. However, SEF was not seeking a continuation award for a future budget period. Rather, the Department terminated an existing grant in the middle of a budget period. The Department's attempt to circumvent

lawful termination procedures by misapplying continuation regulations constitutes a fundamental procedural error.

Second, GEPA establishes specific termination procedures that the Department entirely failed to follow. The Department may only withhold funds from a grantee that is "failing to comply substantially with any requirement of law applicable to such funds." 20 U.S.C. § 1234c(a). Here, the Department made no finding—nor could it—that SEF failed to comply with any legal requirement. Its vague, unsubstantiated references to "DEI initiatives" and alleged inconsistency with the Department's new priorities did not constitute a finding of noncompliance with applicable law.

Finally, even if the Department had identified a legitimate legal violation (which it did not), GEPA requires specific procedural steps before termination. Section 1234d(b) mandates (1) written notice of intent to withhold, (2) a specific explanation of "the factual and legal basis for the Secretary's belief that the recipient has failed to comply substantially with a requirement of law," and (3) "an opportunity for a hearing to be held on a date at least 30 days after the notification has been sent to the recipient." 20 USC § 1234d(b)(2). The Department honored none of these procedural protections. Instead, it terminated SEF's grant effective immediately on February 13, 2025—the same day it issued the termination letter. This abrupt termination without prior notice or opportunity to respond directly contravenes 1234d(d)'s requirement that the agency provide "reasonable notice and an opportunity to show cause why future payments or authority to obligate Federal funds should not be suspended." 20 USC § 1234d(d).

### B. Plaintiff is Likely to Succeed on the Merits of its *Civil Rights Act* Claim *(Fifth Cause of Action)*

Plaintiff is likely to succeed on its fifth claim because the Department's termination of SEF's grant violates Title VI of the Civil Rights Act. Federal agencies may terminate financial

assistance only after "an express finding on the record, after an opportunity for a hearing, of a failure to comply with" applicable requirements under 42 U.S.C. § 2000d-1. The statute mandates that "no such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means." 42 U.S.C. § 2000d-1.

Federal regulations establish that when an investigation reveals a failure to comply with nondiscrimination requirements, "the matter will be resolved by informal means whenever possible." 34 C.F.R. § 100.7(d)(1). Only if noncompliance cannot be corrected by informal means" may an agency effect compliance "by the suspension or termination of or refusal to grant or to continue Federal financial assistance." 34 C.F.R. § 100.8(a).

These procedural safeguards have been reinforced by courts interpreting Title VI enforcement mechanisms. Federal courts have explained that under Title VI, "if an investigation reveals a failure to comply with nondiscrimination requirements, the matter will be resolved by informal means whenever possible." *Texas Low Income Housing Information Service v. Carson*, 427 F. Supp. 3d 43, 48 (D.D.C. 2019) (internal citations omitted). This principle of prioritizing informal resolution extends to all enforcement actions, as courts have emphasized that "only if noncompliance cannot be corrected by informal means may [an agency] effect compliance by the suspension or termination of or refusal to grant or to continue Federal financial assistance." *Id*. (citing 24 C.F.R. § 1.8).

Title VI's enforcement framework follows a mandatory sequence: "Title VI instructs agencies to ensure compliance by aid recipients first through a system of voluntary adherence, and then, if necessary, by initiating a process leading to the termination of federal funding." *Washington Legal Found. v. Alexander*, 984 F.2d 483, 484 (D.C. Cir. 1993). This mandatory

14

sequence is precisely what the Department disregarded in abruptly terminating SEF's grant without any prior notice or opportunity for SEF to address the Department's concerns.

In this case, the Department failed to follow any procedures at all. The Department made no "express finding on the record" (42 U.S.C. § 2000d-1) that SEF had failed to comply with any applicable requirement. The Termination Letter does not identify a single instance where SEF violated any specific provision of Title VI or its implementing regulations. Instead, it offers only vague allegations about "DEI initiatives" without noting any actual or alleged violations.

The Department provided no "opportunity for a hearing" as explicitly required by 42 U.S.C. § 2000d-1. The abrupt termination of SEF's grant on the same day that the Termination Letter was issued deprived SEF of any legitimate opportunity to respond to the Department's allegations, present contrary evidence, or otherwise be heard on the matter. This directly contravenes the statutory requirement that termination occur only "after an opportunity for a hearing." 42 U.S.C. § 2000d-1.

Finally, the Department made no effort to secure compliance through "voluntary means" before terminating the grant. Proper Title VI enforcement typically involves voluntary resolution before termination, as demonstrated in *Texas Low Income Housing*, where the agency "entered into a Voluntary Compliance Agreement with HUD to resolve the matter." 427 F. Supp. 3d at 51. Here, the Department made no effort to work with SEF to address any perceived issues before resorting to the most drastic measure available: termination.

This rushed and procedurally deficient termination process is particularly egregious because SEF was selected in 2022 specifically to address court-ordered desegregation in Region II. The Department's failure to follow the established procedural requirements of 42 U.S.C. § 2000d-1 renders its termination of SEF's grant unlawful under Title VI of the Civil Rights Act.

*Cf. Am. Ass'n of Colls. For Tchr. Educ. v. McMahon*, 2025 U.S. Dist. LEXIS 48368 (D. Md. Mar. 17, 2025, No. 1:25-cv-00702-JRR) (finding similar termination letter insufficient).

### C. Plaintiff is Likely to Succeed on the Merits of its *Constitutional Claims* (Fourth, Sixth, and Seventh Causes of Action)

#### 1. *Department's Violation of the Fifth Amendment (Fourth Cause of Action)*

Plaintiff is likely to succeed on its fourth claim because the Department did not afford Plaintiff due process when depriving it of a benefit based on vague standards that infringe First Amendment freedoms.

Federal agencies must act within clear constitutional and statutory limits. Under the Fifth Amendment and the APA, agency action is unlawful if it is arbitrary, capricious, or not in accordance with law. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. 29, 43 (1983) (finding the procedural requirements for agency action heightened in comparison to Congress's passing legislation). Due process requires that individuals receive fair notice of what conduct is prohibited. *See United States v. Williams*, 553 U.S. 285, 304 (2008); *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

Here, the Department's termination of the EAC-South grant fails to meet even these basic constitutional requirements. The Termination Letter, combined with Executive Orders with similar language, does not define key operative terms—such as "DEI"—yet invokes them as central to the decision to revoke funding. It also separately lists and yet fails to distinguishe these concepts from "desegregation," which is the very statutory purpose of EAC-South's grant under Title IV of the Civil Rights Act, without clarifying how or why they are treated differently. This ambiguity leaves grantees unable to determine what conduct or speech is prohibited, creating a standard that is impermissibly vague and subject to arbitrary enforcement.

Because this vagueness affects not only procedural fairness but also implicates core First Amendment protections, the Department's actions violate both due process under the Fifth Amendment and the constitutional guarantee of free speech.

      *2.  Department's Actions Constitute Ultra Vires Conduct (Sixth Cause of Action)*

Plaintiff is likely to succeed in its sixth claim because Defendants exceeded their constitutional and statutory scope of authority, which led to the flawed decision by the Department to terminate Plaintiff's grant. The essence of an *ultra vires* action is to ensure that the Government operates within the guardrails of constitutional and statutory authority. "A plaintiff must establish three things to prevail on an ultra vires claim: (i) there is no express statutory preclusion of all judicial review; (ii) there is no alternative procedure for review of the statutory claim; and (iii) the agency plainly acts in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *Fed. Express Corp. v. United States DOC*, 39 F.4th 756, 763 (D.C. Cir. 2022). "The D.C. Circuit has further recognized that a claim alleging the President acted in excess of his statutory authority is judicially reviewable even absent an applicable statutory review provision." *Htet v. Trump*, 2025 U.S. Dist. LEXIS 28561 at *2 (D.D.C. Feb. 18, 2025) (citations and internal quotation marks omitted). "*Ultra vires* review is available to challenge *both agency action and inaction*." *See, e.g., Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 26 F.4th 960, 456 U.S. App. D.C. 18 (D.C. Cir. 2022) (holding that plaintiffs stated an *ultra vires* claim by alleging an agency failed to perform a mandatory duty of consultation); *see also Lewis v. United States Parole Comm'n*, 743 F. Supp. 3d 181, 193 (2024).

      *a.  No express statutory exclusion of all judicial review.*

A judicial review of agency actions is essential given the far-reaching implications of their decisions and the potential impact on the public at large. As such, "[c]ourts must presume

the Congress intends that agency action be judicially reviewable." *Ascension Borgess Hosp. v. Becerra*, 557 F. Supp. 3d 122, 129 (D.D.C. 2021). "The presumption of reviewability may be overcome by clear and convincing indications, drawn from specific language, specific legislative history, and inferences of intent drawn from the statutory scheme as a whole, that Congress intended to bar review." *Id.* (citations and internal quotation marks omitted). Review for *ultra vires* acts rests on the longstanding principle that if an agency action is "unauthorized by the statute under which [the agency] assumes to act," the agency has "violate[d] the law" and "the courts generally have jurisdiction to grant relief." *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108, 23 S. Ct. 33, 47 L. Ed. 90 (1902); *see also Chamber of Com. v. Reich*, 74 F.3d 1322, 1327-28, 316 U.S. App. D.C. 61 (D.C. Cir. 1996); *see also Nat'l Ass'n of Postal Supervisors*, 26 F.4th at 970 (D.C. Cir. 2022).

By suddenly terminating the federal grant award to Plaintiff, the Department acted in contravention of the well-established procedures of the APA and purportedly in accordance with newly minted Executive Orders. The Termination Letter (Compl. Ex. D) does not permit the Department an opportunity to sidestep these procedures. Moreover, Defendants are unable to rebut the presumption of judicial review under the APA or GEPA based on statutory construction, interpretation and legislative history.

The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is **entitled to judicial review** thereof. 5 U.S.C. § 702 (emphasis added).

With respect to GEPA, judicial review is expressed as follows:

> Any recipient of funds under an applicable program that would be adversely affected by a final agency action under section 452, 455, or 456 of this Act [20 USCS § 1234a, 1234d, or 1234e] . . . shall be **entitled to judicial review** of such action in accordance with the provisions of this section. The Secretary may not

take any action on the basis of a final agency action until judicial review is completed.

20 USC § 1234g(a) (emphasis added).

Plaintiff is entitled to judicial review under the applicable statutes as none explicitly

provides for an exclusion of all judicial review for agency actions.

### b. No alternative procedure for review.

Plaintiff, who expected the Department to continue making disbursements in accordance

with Grant Award Notification PR/Award Number S004D220011, is without an alternative

mechanism for relief under these dire circumstances.

In *Darby v. Cisneros*, 509 U.S. 137 (1993), the Supreme Court found that the APA, 5 U.S.C. § 704 (1988), explicitly requires exhaustion of all intra-agency appeals mandated either by statute or by agency rule, but courts may not require litigants to exhaust optional appeals as well. *Id.* In this case, there is no exhaustion required by statute or by agency rule.

*Wilhelm v. Caldera*, 90 F. Supp. 2d 3, 7 (D.D.C. 2000) (citations and internal quotation

marks omitted).

Furthermore, "[w]hen a party seeks review of agency action under the APA, the district

judge sits as an appellate tribunal. The entire case on review is a question of law." *Margallo-*

*Gans v. United States Citizenship & Immigration Servs.*, 2024 U.S. Dist. LEXIS 49604 at *7

(D.D.C. Mar. 20, 2024) (citation and internal quotation marks omitted).

On or about March 10, 2025, less than one month after receiving the termination letter

from the Department, Plaintiff responded via a letter formally appealing the decision. *See* Collins

Supp. Aff. Ex. 1. Plaintiff emphatically stated that:

The [Equity Assistance] Center is not a diversity, equity, and inclusion (DEI) initiative or a duplicative program; it is a federally authorized program established under Title IV of the Civil Rights Act to ensure that school districts comply with their legal obligations to provide equal educational opportunities for all students, regardless of race, sex, religion or national origin.

19

Collins Supp. Aff. Ex. 1 at 2.

As was the case in *Darby*, there is no requirement for exhaustion of administrative remedies here under either the APA or GEPA. Indeed, Plaintiff initially acted upon this final agency action from the Department and now must seek relief from the Court, in an appellate posture, because of Defendants' decisions and the imminent and irreparable harm therefrom.

### c. Agency acted in excess of its delegated powers.

It is well understood that the principle of checks and balances is woven into the fabric of the United States Government. For any branch of the Government to step beyond the bounds of their authority damages this material and attacks the cornerstone of democracy.

The Department was established by Congress in 1979 to "ensure that education issues receive proper treatment at the Federal level" and to "coordinate [federal] education activities more effectively." 20 U.S.C. § 3402. Furthermore, it granted the Secretary the authority to supervise and direct the Department. 20 U.S.C. § 3411. Also, "Article II [of the United States Constitution] does not authorize the President to terminate federal grants authorized by Congress." *PFLAG v. Trump,* 2025 U.S. Dist. LEXIS 26702 at *28 (D. Md. Feb. 14, 2025).

Executive Order 14151, signed by the President of the United States on January 29, 2025, calls for "the termination of all discriminatory programs, including illegal DEI and 'diversity, equity, inclusion, and accessibility' (DEIA) mandates, policies, programs, preferences, and activities in the Federal Government, under whatever name they appear." Exec. Order No. 14,151, 90 Fed. Reg. 8339 (Jan. 29, 2025).

Executive Order 14173, signed by the President of the United States on January 21, 2025, requires that executive departments and agencies "terminate all discriminatory and illegal preferences, mandates, policies, programs, activities, guidance, regulations, enforcement actions, consent orders, and requirements." Exec. Order No. 14,173, 90 Fed. Reg. 8633 (Jan. 31, 2025).

The Department, in its February 13, 2025, Termination Letter says it is "a priority of the Department of Education to eliminate discrimination in all forms of education throughout the United States." Compl. Ex. D at 1. The irony is that failing to fund the federal grant awarded to Plaintiff, that is, to assist in the desegregation of public schools in the South, is the antithesis of that priority.

The President and the Department lack the authority to immediately and categorically terminate grant funding that has been appropriated by Congress, based on a policy disagreement with aggregate spending levels set by Congress or to reorder spending priorities inconsistent with congressional budgetary determinations. Indeed, the Executive Branch itself has long recognized that "the suggestion that the President has the constitutional power to decline to spend appropriated funds … is supported by neither reason nor precedent." *Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools,* 1 Supp. Op. O.L.C. 303, 309 (1969) (Rehnquist, A.A.G.). The Supreme Court in *Brown* ruled that segregation in public education is unconstitutional. *Brown*, 347 U.S. 483, supplemented sub nom. *Brown v. Bd. of Educ. of Topeka, Kan.*, 349 U.S. 294 (1955). The United States Congress enacted Title IV of the Civil Rights Act of 1964 to carry out the *Brown* ruling. The Department's termination of SEF's grant undermines Title IV of the 1964 Civil Rights Act and the Supreme Court's ruling in *Brown*.

### 3. *Termination Violates the First Amendment (Seventh Cause of Action)*

Plaintiff is likely to succeed on its First Amendment claim because the Department's termination of SEF's grant constitutes content- and viewpoint-based discrimination that cannot survive strict scrutiny. The Termination Letter, issued in conjunction with relatedExecutive Orders, makes clear that the Department pulled funding based on the belief that SEF's work supports or is associated with diversity, equity, and inclusion initiatives disfavored by the Trump

administration. The termination targets not misconduct, but speech—penalizing SEF for engaging with topics of academic, social, and economic importance. The Department's stated justifications reveal an intent to suppress certain viewpoints on matters of public concern, which the First Amendment squarely forbids.

"It is . . . a basic First Amendment principle that freedom of speech prohibits the government from telling people what they must say." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213 (2013) (internal quotations omitted). This rule applies both to direct prohibitions on speech and to speech-related conditions imposed on benefits that would otherwise be available. *See id.* at 214 (stating "the Government 'may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech even if he has no entitlement to that benefit.'") (quoting *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 59 (2006)). In particular, the Supreme Court has made clear that conditions on federal funding "that seek to leverage funding to regulate speech outside the contours of the federal program itself"—that is, conditions that do more than simply define the kinds of activities Congress wants to subsidize—are regulated by the First Amendment. *Agency for Int'l Dev.*, 570 U.S. at 206. The Supreme Court has held that the government "cannot recast a condition on funding as a mere definition of its program in every case, lest the First Amendment be reduced to a simple semantic exercise." *Id.* at 215 (citing *Legal Services Corporation* v. *Velazquez*, 531 U.S. 533, 547 (2001)). That is what has occurred here. The Department's purported change in Priorities that define its programs is actually a condition on the receipt of funding. That is, not speaking about DEI—in whatever way the Department defines it—is a precondition to the EAC-South grant.

The Termination Letter—especially when read alongside the relevant Executive Orders—uses federal funding to coerce ideological conformity. It makes clear that only grantees who adopt the administration's views, remain silent, or reframe their work to fit its preferred opinion of diversity and equity (however defined) will be funded. This is classic viewpoint discrimination. Conditioning funding on ideological conformity is not just coercive—it is a direct attempt to silence disfavored viewpoints through financial pressure.

The First Amendment problems with the Termination Letter and Executive Orders are twofold. First, the conditions described in the Termination Letter and Executive Orders are impermissibly vague in a way that will inevitably lead to chilling of protected expressive conduct and speech. Second, to the extent that grantees and courts may be able to define and decipher the conditions, they will find that they discourage the discussion of certain controversial topics entirely, and specifically, the expression of particular viewpoints within those topics, making the conditions a content-based and viewpoint-based regulation of speech.

a. *The termination of SEF's grant deprived SEF of due process due to vague standards chilling protected expression.*

The Department's termination of the EAC-South grant violates due process protections by enforcing vague standards that fail to provide fair notice and that chill protected speech. The Termination Letter asserts multiple possible justifications for the grant termination, all of which bear no rational connection to the facts. Specifically, it claims that the grant either: (1) "provides funding for programs that promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic"; (2) "violate[s] either the letter or purpose of Federal civil rights law"; (3) "conflict[s] with the Department's policy of prioritizing merit, fairness, and excellence in

23

education"; (4) "[is] not free from fraud, abuse, or duplication"; or (5) "otherwise fail[s] to serve the best interests of the United States." Compl. Ex. D at 1-2.

A regulation is unconstitutionally vague if it fails to provide fair notice of what is prohibited or invites arbitrary enforcement. *See Grayned*, 408 U.S. at 108 (holding that laws must provide explicit standards for those who apply them to prevent arbitrary and discriminatory enforcement). This standard is especially rigorous when First Amendment rights are at stake, as vague laws can chill protected expression and allow for discriminatory enforcement based on disfavored viewpoints. *See Keyishian v. Bd. of Regents*, 385 U.S. 589, 603-604 (1967) (holding that "precision of regulation must be the touchstone in an area so closely touching our most precious freedoms," when referring to regulation in education) (citing *NAACP v. Button*, 371 U.S. 415, 438 (1963)). The Department's failure to define the concepts of "DEI," "merit," "fairness," and "excellence in education" in the Termination Letter (or elsewhere) creates shifting standards that provide no clear guidance to grantees, thus inviting arbitrary enforcement.

The agency relied on the undefined and amorphous concept of "DEI" as a central justification for termination yet explicitly distinguished it from civil rights compliance—implying that DEI represents a broader, subjective category known only to the Department. It also invoked additional vague terms like "merit," "fairness," and "excellence in education," without defining them or explaining their relationship to DEI. These open-ended standards provide no clear guidance as to what conduct or speech is prohibited and invite arbitrary enforcement. The Department's juxtaposition of DEI initiatives with discriminatory programs further compounds the ambiguity, increasing the risk that undefined terms will be interpreted in ways that chill protected expression. As the Supreme Court has cautioned, where a regulation contains "internal tension between proscription and protection," courts cannot presume that in

enforcing that regulation "ambiguities will be resolved in favor of adequate protection of First Amendment rights." *NAACP*, 371 U.S. at 438.

This vagueness is compounded by the fact that the Department is penalizing EAC-South for engaging in advocacy on issues of racial equity, desegregation, and educational disparities—matters of significant public concern. *See Agency for Int'l Dev.*, 570 U.S. at 218 (holding that a condition on funding that demands recipients adopt the government's view on an issue of public concern affects "protected conduct outside the scope of the federally funded program") (quoting *Rust v. Sullivan*, 500 U.S. 173, 197 (1991)). Such conditions impermissibly seek to "leverage funding to regulate speech outside the contours of the federal program itself" and improperly require recipients to "pledge allegiance to the Government's policy" as a condition of funding. *Agency for Int'l Dev.*, 570 U.S. at 218-219. These principles are particularly relevant here, where the Department's conditions "by [their] very nature" affect protected First Amendment activities related to educational equity. *Id.* at 218. The termination of funding for a program authorized under the very civil rights statute the Department claims may have been violated further underscores the pretextual and arbitrary nature of its action.

> b. *The grant termination pursuant to the Termination Letter constitutes a content-based and viewpoint-based regulation of SEF's speech.*

Government regulation of speech is content-based when it targets expression because of the subject matter or the specific idea conveyed. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Content-based regulations are "presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Id.* That is because such laws inherently "lend[] [themselves] to use for [invidious, thought-control] purposes." *Id.* at 167 (quoting *Hill v. Colorado*, 530 U.S. 703, 743 (2000) (Scalia, J., dissenting)). The First Amendment's protection against content-based regulation extends not

25

only against viewpoint discrimination, but also against "prohibition of public discussion of an entire topic." *Consol. Edison Co. v. Pub. Serv. Comm'n*, 447 U.S. 530, 537 (1980).

The Department's termination of EAC-South's grant is a content-based restriction on speech. The Termination Letter targets perceived support for DEI—a broadly defined and politically charged subject—without identifying any unlawful conduct. It treats speech about DEI initiatives as presumptively suspect and penalizes engagement with that topic. This is precisely the kind of content-based regulation the First Amendment forbids. "If the marketplace of ideas is to remain free and open, governments must not be allowed to choose 'which issues are worth discussing or debating.'" *Consol. Edison*, 447 U.S. at 537–38 (quoting *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 96 (1972)). Yet that is exactly what the Department has done here. It identified DEI—which, by any interpretation, is a broad subject of academic, legal, and social significance—as disfavored, and issued vague justifications to chill speech on that topic.

The government action here is not only based on subject matter regulation—it is also viewpoint-based, targeting specific perspectives within a broader subject matter. "Discrimination against speech because of its message is presumed to be unconstitutional." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995). And "[w]hen the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Id.* That prohibition applies fully to recipients of government grants. *Agency for Int'l Dev.*, 570 U.S. at 214–15 ("A funding condition that limits speech outside the scope of the program is unconstitutional when it compels the recipient to adopt the government's viewpoint.").

Here, the Department's termination of the EAC-South grant is grounded in opposition to the viewpoints it believes the grantee supports—namely, so-called "DEI" and supposedly related

concepts. The Termination Letter refers broadly to alleged support for "DEI initiatives" and suggests that the grantee's programming may "conflict with the Department's policy of prioritizing merit, fairness, and excellence in education." But it offers no evidence that the grantee has engaged in unlawful conduct, nor does it define what constitutes impermissible support for DEI. Instead, the agency disapproves of the general ideological orientation it perceives in the grantee's work.

This type of vague and content-targeting punishment is unlawful. *See Agency for Int'l Dev.,* 570 U.S. at 214 (holding that the government may not deny a benefit, including grant funding on a basis that infringes the recipient's constitutionally protected freedom of speech, even if it has no entitlement to that benefit). Targeting ideology in this way chills grantees from engaging in protected advocacy for fear of punishment.

Therefore, because the grant termination pursuant to the Termination Letter is a content- and viewpoint-based regulation of speech, it is subject to strict scrutiny by a reviewing court.

        *c.* *The grant termination pursuant to the Termination Letter will not survive strict scrutiny.*

"As a general matter, a content-based regulation is presumptively unconstitutional and may be justified only if the government proves that [it is] narrowly tailored to serve compelling state interests." *Vidal v. Elster*, 602 U.S. 286, 293 (2024) (internal quotation marks omitted)).

The government has not identified a compelling interest that justifies its termination of the EAC-South grant. A desire to suppress or disfavor certain viewpoints is never a legitimate— let alone compelling—interest under the First Amendment. *See RAV v. City of St. Paul*, 505 U.S. 377, 396 (1992) (holding that expressing government disapproval of particular viewpoints is not a legitimate interest and is exactly what the First Amendment forbids). Even if the government claims interests such as preventing unlawful discrimination or misuse of federal funds, those

interests cannot justify the termination here, because the action is not narrowly tailored to advance them. *See Id.* at 395 (holding that a facially content based statute can only by employed where it is "*necessary* to serve an asserted [compelling] interest") (citing *Burson v. Freeman*, 504 U. S. 191, 199 (1992) (plurality opinion) (emphasis added)).

The Termination Letter does not point to any specific conduct by EAC-South that violates federal law or grant conditions. Instead, it cites several vague and generalized concerns, such as involvement in "DEI initiatives" or activities that purportedly conflict with undefined principles like "merit" or "fairness." No one justification is identified as the actual basis for the grant's termination. This ambiguous, multi-justification approach creates confusion about what conduct or speech is actually prohibited.

Because the standards are so unclear, grantees are left to guess at the Department's expectations—forcing them to alter or withhold protected speech, even speech outside of the grant-funded program, to avoid the risk of funding loss. *See Agency for Int'l Dev.*, 570 U.S. at 220-21 (2013) (holding that a policy that would restrict or compel speech went beyond preventing recipients from using funds in a way that undermines legitimate federal goals and extends to compelling speech). This chilling of speech, caused by vague and broad enforcement, shows the government's approach is far from the least restrictive means of achieving any legitimate end. *See RAV*, 505 U.S. at 395 (1992) (holding that "[t]he existence of adequate content neutral alternatives . . . cast[s] considerable doubt on the government's protestations that 'the asserted justification is in fact an accurate description of the purpose and effect of the law'") (quoting *Burson v. Freeman*, 504 U. S. 191, 213 (1992) (Kennedy, J., concurring)).

Accordingly, because the Department's action is not narrowly tailored to serve any compelling government interest, and instead appears designed to suppress disfavored speech, the

grant termination cannot survive strict scrutiny. Plaintiff is therefore likely to prevail on the merits of its First Amendment claim.

## II.    Plaintiff Will Suffer Irreparable Harm Without an Injunction

### A.  Immediate Existential Financial and Operational Harms

The Department's abrupt termination of SEF's EAC grant has caused immediate and severe financial and operational harm. The termination has deprived SEF of the sole source of funding for EAC-South, resulting in an immediate cessation of program operations and services. The termination of the grant will result in a $1,924,031.96 annual loss to SEF, including outstanding payments of $293,681.78 for the current EAC-South program. Compl. ¶ 86. Additionally, the termination of the grant will result in $3,371,108 overall loss, including the remaining two budget periods of a year each. Compl. ¶ 86.

The impact of the termination extends beyond monetary loss. The Department terminated SEF's grant in the middle of a budget period without prior notice, causing immediate operational disruption to an otherwise stable and functioning program. This disruption has forced SEF to shut down EAC-South entirely, as the grant was its exclusive funding source. Unlike ordinary economic damages that might be remedied through monetary compensation after litigation, the immediate cessation of operations has resulted in the loss of experienced staff, interrupted ongoing technical assistance projects, and dismantled specialized resources that SEF had assembled since receiving the grant in 2022. This is an existential threat to what SEF has built.

SEF invested considerable time and resources in building an assistance center specifically designed to address the unique challenges of the southern region. This infrastructure cannot be easily reconstituted after a forced shutdown, even if monetary damages are awarded later. The dismantling of this operational capacity constitutes irreparable harm that cannot be adequately remedied through post-trial relief.

### B.  Irreparable Harm to SEF's Reputation and Relationships

Beyond immediate financial and operational impacts, the termination has inflicted serious and irreparable damage to SEF's reputation and crucial relationships built over decades. SEF has developed significant goodwill and trust with school districts across the South through its 158-year history of advancing equitable education, including its historical involvement in supporting the legal battle that led to the landmark *Brown v. Board of Education* decision.

School districts that have relied on SEF and EAC-South for assistance with desegregation orders and civil rights compliance are now being forced to look elsewhere for support. This sudden disruption jeopardizes SEF's credibility with these districts, as they can no longer depend on the organization to provide consistent, federally authorized assistance. The abrupt termination creates a perception that SEF has somehow failed to fulfill its obligations, despite the fact that the termination was unrelated to any deficiency in SEF's performance under the grant.

This reputational damage extends beyond the EAC program to other aspects of SEF's work. If school districts cannot rely on SEF to help them comply with desegregation orders, they may be less likely to engage with the organization on other educational equity initiatives. This undermines the reliability and goodwill that SEF has been developing in the southern public education system for more than a century and a half. Such reputational harm is inherently irreparable and cannot be adequately compensated through monetary damages.

### C.  Irreparable Harm to Educational Agencies and Students Served

The termination of the EAC-South grant inflicts severe and irreparable harm on the educational agencies and students that SEF serves. At the time of termination, EAC-South was actively providing technical assistance to 130 school districts under active federal desegregation orders. EAC-South was providing critical support to Fayette County Public Schools in Tennessee, which has remained under a federal desegregation order since 1965. With EAC-

South's expert assistance, the district achieved partial unitary status as determined by a federal court and was making substantial progress toward full compliance.

The termination has abruptly cut off this vital assistance, leaving these districts without the specialized support they need to address ongoing desegregation efforts and educational inequities. Region II contains 130 of the 132 remaining open federal school desegregation cases in the United States—precisely the type of cases Title IV was enacted to remedy through federally authorized technical assistance. Without EAC-South, these districts have lost access to free, specialized technical assistance services that they actively sought to address compliance with civil rights obligations.

The harm to these districts is compounded by the fact that EAC-South is uniquely positioned to provide this support. It is the only center of its kind in the region, offering expert assistance at no cost regardless of a district's resources. The removal of this federally funded assistance imposes a significant financial burden on school districts because they will be forced to obtain such services elsewhere. Many districts with limited resources will likely be unable to afford comparable assistance, resulting in delayed progress toward desegregation and compliance with federal civil rights laws, and interfering with EAC-South's ability to provide legal counsel to these districts.

Ultimately, the students in these districts—particularly those from historically marginalized communities—will bear the greatest burden of this harm. The interruption of desegregation and educational equity efforts directly impacts their access to equal educational opportunities, a harm that cannot be remedied after the fact through monetary compensation. Each day that passes without these services represents an irretrievable loss of educational opportunity for these students.

31

### D. Irreparable Harm to SEF's First Amendment Rights

Moreover, the harm done to SEF's free speech rights is automatically irreparable. The grant termination pursuant to the Termination Letter acts as a restriction on speech, and therefore threatens immediate and irremediable constitutional harm by restricting speech and coercing conformity with the government's views, thus depriving grant recipients of the exercise of their First Amendment rights. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)); *accord Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016).

## III.    The Balance of Equities Favors Plaintiff

If this Court grants the requested injunction, the Department will suffer little, if any, harm. The injunction would merely require the Department to continue a program that has been operating successfully and without controversy since 2022 and is explicitly authorized by Title IV of the Civil Rights Act. The Department has already appropriated and obligated funds for this program through the current fiscal year, meaning no additional financial burden would be imposed on the government.

Additionally, the Department has not identified any specific harms that would result from SEF's continued operation of EAC-South. The Termination Letter provides no evidence that SEF has failed to perform its duties under the grant or violated any applicable laws. Rather, the Department would merely be required to honor its existing legal obligations until the Court can properly review the merits of this case.

## IV.    Plaintiff Will Suffer Substantial Harm if the Injunction is Denied

Without injunctive relief, SEF will continue to suffer severe and irreparable harm that extends well beyond the immediate financial impact.

Although SEF is currently owed $78,960.83 in outstanding payments and $214,720.95 in expenses for services rendered prior to February 13, 2025, the Department's abrupt termination has caused substantial damage that cannot be adequately remedied through later monetary compensation. This immediate financial burden further results in irreparable harm because it undermines SEF's operational stability and creates uncertainty about its ability to sustain operations and fulfill its federally mandated mission.

Moreover, the termination has derailed ongoing technical assistance to school districts with active desegregation obligations. Region II encompasses eleven states and the District of Columbia, containing 2,518 public school districts and serving 17 million students, including 11 million students of color. The Department of Justice confirms that 130 of the nation's 132 active federal school desegregation cases are concentrated in this region. The termination came without warning and abruptly halted critical assistance to districts like Fayette County Public Schools in Tennessee, which has been under a federal desegregation order since 1965. With EAC-South's support, this district had achieved partial unitary status. The sudden termination jeopardizes this progress and places districts at risk of noncompliance with court mandates, threatening students' constitutional rights under the Equal Protection Clause.

The termination impacts multiple ongoing technical assistance projects actively helping districts improve educational outcomes. SEF has successfully executed 22 technical assistance projects and had nine pending requests that have now been disrupted. These included assistance to Texas charter networks that resulted in significant academic growth and compliance with state targets, support for a district in Arkansas expanding access to advanced programs, and assistance to Mississippi Delta districts enhancing mental health and special education systems. The EAC-South's assistance in revising discipline policies led to a dramatic reduction in disciplinary

hearings in one district there fostering fairer school environments conducive to student success. Each interrupted project represents lost momentum toward addressing disparities in education resources, discipline policies, and instructional practices that may never be reparable.

The EAC program, including EAC-South, is not merely a discretionary program—it is the only federally authorized technical assistance center created under Title IV to ensure that school districts comply with their legal obligations. The termination contradicts the enforcement of federal civil rights laws and threatens progress toward eliminating racial segregation in education. The termination letter gives no evidence of noncompliance with grant terms or federal law. Instead, it represents an arbitrary decision inconsistent with established grant administration protocols.

Unlike other types of harm that might be remedied through post-trial relief, these ongoing impacts cannot be adequately addressed through monetary damages. The relationships, trust, and momentum built through years of technical assistance work are being irreparably damaged with each passing day, and districts under court order are losing precious time in their efforts to achieve unitary status and fulfill their legal obligations. Without an injunction, the harm to public education systems and the enforcement of civil rights will be substantial and enduring.

## V.  An Injunction Will Serve the Public Interest

### A.  Public Interest in Proper Administrative Procedures

The public interest strongly favors enforcement of lawful administrative procedures, particularly when federal agencies exercise their power to terminate grants established by Congress. The Department's disregard for mandatory GEPA procedures undermines public confidence in federal grant administration and threatens the entire system of cooperative federalism in education policy. As the D.C. Circuit has recognized, "there is an overriding public interest both in the particular facet determined by Congress . . . and in the general importance of

34

an agency's faithful adherence to its statutory mandate." *Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 59 (D.C. Cir. 1977).

The Department's termination without notice, hearing, or opportunity to respond, contradicts fundamental principles of administrative law designed to ensure agency accountability. Requiring the Department to follow proper termination procedures not only protects SEF, but also upholds the integrity of all federal grant programs. When agencies can arbitrarily terminate grants without following the procedures established by Congress, it undermines public trust in government and creates uncertainty for all grantees engaged in federally funded public interest work.

The Supreme Court has emphasized that the government must honor its obligations. In *Salazar v. Ramah Navajo Chapter*, the Court recognized that government funding commitments are binding and that agencies that renege on promises damage the government's long-term interests. 567 U.S. 182, 192 (2012) (affirming "the Government's own long run interest as a reliable contracting partner in the myriad workaday transaction of its agencies") (quoting *United States v. Winstar Corp.*, 518 U.S. 839, 883 (1996). *Salazar* involved contactors rather than grantees, but the underlying principle applies with equal force: when the government makes a commitment to provide funds, the public interest is served by holding the government to its word. When agencies refuse to honor their commitments, it undermines public confidence and drives up the cost to taxpayers of working with the government. *Salazar*, 567 U.S. at 192.

Lastly, allowing agencies to terminate grants based on vague, undefined terms like "DEI initiatives," without providing specific standards or definitions creates dangerous precedent that would threaten due process for all recipients of federal funding. The public has a strong interest

in ensuring that federal agencies act within their constitutional and statutory boundaries, particularly when their actions impact programs explicitly authorized by Congress.

### B. Public Interest in Desegregated Education

The public interest in desegregated education has been recognized by courts since *Brown v. Board of Education*, which declared that "in the field of public education the doctrine of 'separate but equal' has no place. Separate educational facilities are inherently unequal." 347 U.S. 483, 495 (1954). Congress established EACs precisely to advance this compelling public interest through technical assistance to school districts to address desegregation challenges.

The Department's termination of SEF's grant threatens this public interest by leaving 130 school districts under active federal desegregation orders without necessary assistance. Region II, which encompasses eleven southern states and the District of Columbia, contains 98% of all remaining open federal school desegregation cases. Compl. ¶ 29. These districts serve seventeen million students, including eleven million students of color, who will be directly harmed by the loss of EAC-South's services. Collins Supp. Aff. Ex. 1 at 1 n1.

The public interest in ensuring equal educational opportunity for all students is not merely aspirational: it is a constitutional imperative under the Fourteenth Amendment. Federal, state, and local authorities have an affirmative duty to take all steps necessary to eliminate racial discrimination in school systems "root and branch." *Green*, 391 U.S. at 437–38. EAC-South plays a critical role in fulfilling this mandate by providing specialized assistance to help school districts comply with their constitutional and court-ordered obligations. Without this support, progress toward eliminating racial discrimination will be stalled—or worse, reversed—contrary to both Congress's intent in Title IV and the constitutional principles enshrined in *Brown*.

VI.    **No Bond Should Be Required**

This Court has discretion under Federal Rule of Civil Procedure 65(c) to waive the bond requirement for preliminary injunctions, particularly for non-profit organizations serving the public interest. "District courts have broad discretion . . . to determine the appropriate amount of an injunction bond. This includes discretion not only to set the amount of security but to dispense with any security requirement whatsoever where the restraint will do the defendant no material damage." *AP v. Budowich*, 2025 US Dist. LEXIS 66994 (DDC Apr. 8, 2025, No. 1:25-cv-00532 (TNM)). Here, SEF is a non-profit organization with a 158-year history of advancing equitable education in the public interest. The requested injunctive relief merely preserves the status quo by continuing funding for a program authorized by Congress through the Civil Rights Act and operating successfully since 2022. The Department faces no financial risk from providing previously appropriated funds for this congressionally mandated program. Therefore, the Court should waive the bond requirement, as it would impose undue hardship on SEF and potentially prevent vindication of important statutory and constitutional rights.

## CONCLUSION

For the foregoing reasons, the Court should issue a temporary restraining order and preliminary injunction in Plaintiff's favor and against Defendants.

Dated:       Monday, April 21, 2025

       Baltimore, MD                          Respectfully submitted,

                  */s/ Lucrecia P. Johnson*          ROMANO LAW PLLC
                  Lucrecia P. Johnson, Esq.        */s/Jamar Creech*
                  DC Federal Bar# 1015623         Jamar Creech
                  LPJ Legal PLLC                  Senior Counsel
                  853 New Jersey Ave SE,          7200 Wisconsin Avenue
                  Suite 200                       Suite #500
                  Washington, DC 20003            Bethesda, MD 20814
                  lucrecia@lpjlegal.com           jamar@romanolaw.com
                  (202) 643-6211                  (212) 865-9848

## Page Limit Certification

    I hereby certify that this memorandum complies with the page limitations set forth in Local Rule 7(e). This memorandum contains 45 pages, including the caption, table of contents, table of authorities, signature block, and this certification.

                           Respectfully submitted,

                  */s/ Lucrecia P. Johnson*          ROMANO LAW PLLC
                  Lucrecia P. Johnson, Esq.        */s/Jamar Creech*
                  DC Federal Bar# 1015623         Jamar Creech
                  LPJ Legal PLLC                  Senior Counsel
                  853 New Jersey Ave SE,          7200 Wisconsin Avenue
                  Suite 200                       Suite #500
                  Washington, DC 20003            Bethesda, MD 20814
                  lucrecia@lpjlegal.com           jamar@romanolaw.com
                  (202) 643-6211                  (212) 865-9848