## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SOUTHERN EDUCATION FOUNDATION, INC. <br> 101 Marietta Street <br> Suite 1600 <br> Atlanta, GA 30303 <br><br>                  *Plaintiff,* <br><br>             v. <br><br> UNITED STATES DEPARTMENT OF EDUCATION; <br> 400 Maryland Avenue, SW <br> Washington, DC 20202 <br><br> LINDA MCMAHON, UNITED STATES SECRETARY OF EDUCATION, *in her official capacity*; <br> 400 Maryland Avenue, SW <br> Washington, DC 20202 <br><br> and, <br><br> DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES OF AMERICA, *in his official capacity;* <br> c/o Attorney General of the United States of America <br> U.S. Department of Justice <br> 950 Pennsylvania Avenue, NW <br> Washington, DC 20530-0001 <br><br>                *Defendants.* | Case No.  1:25-cv-01079-PLF <br><br> SUPPLEMENTAL COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |

## SUPPLEMENTAL COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.       Plaintiff files this Supplemental Complaint pursuant to Rule 15(d) of the Federal Rules of Civil Procedure to allege events that occurred after the original complaint. Specifically,

Plaintiff alleges, *inter alia*, that on May 16, 2025, Plaintiff withdrew its administrative appeal before the Department of Education. Plaintiff further alleges that the withdrawal of its appeal is beyond the time prescribed in the February 13, 2025, termination letter from the Department of Education, and thus the termination is considered a final agency action under the General Education Provisions Act and Administrative Procedure Act.

2.      Plaintiff further alleges, *inter alia*, that on May 14, 2025, the Department of Education remitted payment of the outstanding balance of $293,681.78 for expenses incurred on or before February 13, 2025—the date of the grant's termination. This post-complaint disbursement of funds further reinforces that the termination constitutes a final agency action subject to judicial review under the General Education Provisions Act and the Administrative Procedure Act.

3.      This case concerns the United States Department of Education's ("the Department") abrupt and unlawful decision to terminate the Equity Assistance Center for the southern region ("EAC-South"), grant authorized under Title IV of the Civil Rights Act of 1964, 42 U.S.C. 2000c-2 ("Title IV") and operated by the Southern Education Foundation, Inc. ("SEF").

4.      For nearly a century, African American children were subjected to lawful racial segregation in public education. The U.S. Supreme Court in *Brown v. Board of Education* ruled that racial segregation in public education was unconstitutional and ordered the desegregation of our nation's systems of public education.

5.      In Title IV, Congress authorized the Department to provide "technical assistance in the preparation, adoption and implementation plans for the desegregation of public schools." 42 U.S.C. §2000c-2. To advance this objective, and as prescribed by federal regulations, the Department provides financial assistance to operate regional Equity Assistance Centers ("EACs")

and awards these grants to eligible entities, including nonprofit organizations. Every year, Congress appropriates funding for training and technical assistance, specifically under Title IV of the Civil Rights Act, and directs the Department to distribute these funds. After Congress appropriates funds to the Department, and the Office of Management and Budget (the "OMB") apportions the funds for training and technical assistance programs. Every year, the Department obligates these grant funds to EAC grantees competitively selected for a full twelve-month budget period. Grantees are permitted to draw down (or spend) previously obligated funds during the approved budget period until September 30th of each budget year.

6.    However, on February 13, 2025, EAC-South was no longer permitted to spend funds when the Department terminated, abruptly and without notice, EAC-South's ability to draw down funds previously obligated to SEF and issued a Grant Award Notification (GAN) terminating SEF's grant and project.

7.    For over 150 years, SEF has advocated for equal education access for all. SEF educated formerly enslaved persons following the U.S. Civil War; it built schools, trained teachers, and developed education leaders in its efforts to dismantle segregated education. SEF continues its work by developing sound practices in education administration and supporting leadership development in education. Since its 1867 founding, SEF has remained dedicated to advancing education opportunity.

8.    SEF was actively involved in advancing the preparation and implementation of the Supreme Court's landmark 1954 ruling in *Brown v. Board of Education*. In the years following the *Brown* decision and amid decades of ongoing civil rights advocacy, the Civil Rights Act of 1964 was signed into law by President Lyndon B. Johnson. Title IV was at the center of SEF's work, which empowered federal efforts to desegregate public schools. SEF actively supported and

advocated for the enforcement of Title IV to help dismantle the nation's unconstitutionally racially segregated education system.

9.     As part of SEF's strategy to address to the continuing harms of school desegregation, SEF decided in 2020 to apply for the federal grant to operate the southern region's desegregation assistance center (or "technical assistance center"), renamed in 2016 as the Equity Assistance Center, or here, EAC-South.  In applying for the grant, SEF aimed to resolve remnants of segregated education, evidenced at least by the overwhelming number of open federal court desegregation orders in the southern states. SEF intended for the EAC-South to lead the charge on removing remaining impediments to equal access to quality education.

10.     In 2022, the Department notified SEF that, based on its application, it was awarding SEF the grant to operate the EAC-South.

11.     Since receiving the grant, SEF has invested significant time and resources into building a technical assistance center specifically designed to confront the high concentration of unresolved federal school desegregation cases in the southern region. Additionally, the Center delivers research-based, targeted support to public schools still struggling with the lingering effects of segregation that continue to limit educational opportunity for students.

12.     President Donald J. Trump assumed office on January 20, 2025, and on that same day signed Executive Order 14151, titled "Ending Radical and Wasteful Government DEI Programs and Preferencing" (Executive Order 14151). Executive Order 14151 declared that the Biden Administration's intention to support diversity, equity, and inclusion programming was "illegal and immoral discrimination." Executive Order 14151 ordered federal agencies to terminate "all 'equity action plans,' 'equity' actions, initiatives, or programs, 'equity-related' grants or contracts."

13.     On January 21, 2025, President Trump signed Executive Order 14173, titled "Ending Illegal Discrimination and Restoring Merit-Based Opportunity" ("Executive Order 14173" and together with Executive Order 14151, signed on January 20, the "DEI Executive Orders"). Similar to Executive Order 14151, this order declared that programs supporting diversity, equity, and inclusion "can violate the civil-rights laws of this Nation," and ordered executive departments and agencies to "terminate all discriminatory and illegal preferences, mandates, policies, programs, activities, guidance, regulations, enforcement actions, consent orders, and requirements."

14.     The Department issued a letter to SEF on February 13, 2025, abruptly terminating funding for EAC-South (the "Termination Letter"). However, the letter failed to provide any explanation of how EACs generally—or EAC-South specifically—allegedly promoted diversity, equity, and inclusion initiatives now considered inconsistent with the Department's priorities. It offered no evidence that EAC-South engaged in any form of unlawful discrimination based on race, color, religion, sex, national origin, or any other protected characteristic. Nor did it clarify how EAC-South conflicted with Department policy or violated the very federal civil rights laws that authorized and funded its creation.

15.     The Department's stated basis for terminating the grant and denying access to Congressionally appropriated funds previously obligated to SEF is contrary to the Constitution, statute, and regulations. Moreover, the Department failed to follow applicable statutory due process procedures. The immediate termination constitutes an agency action that lacks reasoned decision-making and is arbitrary, capricious, and not in accordance with law under the Administrative Procedure Act ("APA").

16.     The termination of EAC-South's grant is unlawful, unjustified, and impedes the important work of assisting school districts to comply with federal civil rights law. Far from violating federal civil rights law, EAC-South–the funding for which is authorized by Title IV– enforces the civil right law by helping schools comply with federally mandated desegregation and ensure equal educational opportunity.

17.     This abrupt, unlawful termination doesn't just harm SEF as the grantee; it harms the public institutions that rely on EAC-South's services to fulfill their legal obligations to provide equitable education for all students. Even more, it directly and immediately harms the students who would otherwise benefit from EAC-South services.

18.     The Department's unlawful termination will force the immediate cessation of critical technical assistance and services, inflicting irreparable harm to SEF and EAC-South, as well as the school districts and communities that rely on their support. The implementation and enforcement of the DEI Executive Orders as applied to SEF's grant and the termination of SEF's grant must be enjoined to avoid immediate irreparable harm.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1361. This Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202.

20.     Venue is proper in this district because this action is against an officer, employee, and/or agency of the United States and a substantial part of the events or omissions giving rise to the claim occurred in this judicial district. 28 U.S.C. § 1391(e).

## PARTIES

21.    Plaintiff **Southern Education Foundation, Inc.** is a 501(c)(3) nonprofit organization that has been committed to advancing equitable education policies and practices for public school students across the Southern United States for over 150 years. SEF is organized under the laws of New York and is headquartered in Atlanta, Georgia.

22.    Defendant **United States Department of Education** is a federal agency headquartered in Washington, D.C., with the responsibility of providing funding to critical institutions and nonprofits supporting education, like Plaintiff, in the United States.

23.    Defendant **Linda McMahon** is the United States Secretary of Education. She is sued in her official capacity.

24.    Defendant **Donald J. Trump** is the President of the United States. He is sued in his official capacity.

## FACTUAL AND LEGAL BACKGROUND

### A.  SEF's 158-Year History Advancing Desegregation of Schools in the South.

25.    In the final months of the U.S. Civil War, Congress established the Bureau of Refugees, Freedmen and Abandoned Lands (the "Freedmen's Bureau") in part to provide education for persons freed from enslavement by the Union Army. Northern charities soon began shipping books and paying to send teachers to southern states to support the work of the Freedman's Bureau. When the war ended, philanthropies were formed to continue and scale up the effort of educating the masses of formerly enslaved persons and poor Whites in the southern states. In 1867, two years after the end of the Civil War, financier George Peabody established the Peabody Education Fund to support the establishment of a permanent public education system in the southern U.S. and to grow the number of qualified teachers in the region. Shortly afterwards, the Slater Fund, the Jeanes Fund, the Rosenwald Fund and the Virginia Randolf Fund were

established with the similar purpose of training teachers, providing books, and building schools for the education of the formerly enslaved persons and poor Whites in the southern states. In 1937, these foundations, with the exception of the Rosenwald Fund, were consolidated to form what is now the Southern Education Foundation. Since 1867, SEF's mission has been to advance educational opportunity.[1]

26.    In addition to its role in the development of public education in the South, SEF provided significant assistance to the effort to prove the unconstitutionality of the then-lawful practice of segregating public education on the basis of race. SEF provided convening and research support for Thurgood Marshall and the team of lawyers in preparation for the line of cases leading up to *Brown v. Board of Education*. Notably, a year before the 1954 *Brown* decision, SEF housed researchers who were compiling a national survey on the conditions of education for African American students—work that informed and strengthened the case against segregation.

B. **Title IV of the Civil Rights Act of 1964 and the Establishment of Equity Assistance Centers.**

27.    The Supreme Court's ruling in *Brown v. Board of Education* did not alleviate all barriers to desegregated public education in the U.S., as some states and school districts refused to integrate their school systems despite the holding that it was unconstitutional to do so.

28.    In recognition of these challenges, Title IV of the Civil Rights Act of 1964 authorized the Secretary of the Department of Health, Education, and Welfare to enact measures that would provide schools or other relevant government entities with technical assistance in addressing these challenges. 42 U.S.C. § 2000c-2.

---

[1] *Who We Are: Our Mission*, Southern Educ. Foundation, https://southerneducation.org/who-we-are/ (last visited Apr. 9, 2025).

29.     Following Title IV's passage, Desegregation Assistance Centers were established to provide technical assistance in the "preparation, adoption, and implementation of plans for desegregation of public schools." 42 U.S.C. § 2000c-2; 34 C.F.R. § 270.1. When they were first established, the focus of the Centers was primarily on racially desegregating schools. By the early 1990s, the goals of the Centers expanded with the implementation of the Improving America's Schools Act of 1994. With this expansion, the Centers shifted focus to assisting students to achieve academic excellence *regardless of* race, sex, national origin, linguistic differences, cultural and social characteristics, economic circumstances, and disability.

30.     In 2016, the Department conducted a formal rulemaking process, renaming "Desegregation Assistance Centers" as "Equity Assistance Centers."[2] This name change did not change the mission, but merely reflected the Centers' expansion to support even more statutory mandates in public education.

31.     In 2022, SEF applied for and received the award to operate the EAC for the southern region (Region II). Region II is comprised of Alabama, Arkansas, Florida, Georgia, Louisiana, Mississippi, North Carolina, South Carolina, Tennessee, Texas, Virginia and the District of Columbia. Additionally, Region II contains 130 of the 132 remaining open federal school desegregation cases—precisely the type of cases Title IV was enacted to remedy through federally authorized technical assistance and enforcement. Pursuing the original purpose of Title IV by supporting the resolution of these 130 open federal court desegregation cases was the major factor

---

[2] Federal Register, *Equity Assistance Centers (Formerly Desegregation Assistance Centers): A proposed rule by the Education Department on 3/24/2016*, available at: https://www.federalregister.gov/documents/2016/03/24/2016-06439/equity-assistance-centers-formerly-desegregation-assistance-centers ("Ultimately, the purpose of the regional centers is to ensure access to educational opportunities for all students without regard to their race, sex, national origin, or religion.").

in SEF applying for the EAC grant. The current list of school districts under active desegregation orders is attached as **Exhibit A.** The Department's investment in desegregation technical assistance in Region II represents the greatest opportunity in recent years for targeted focus and resolution of the nation's federal docket of open school desegregation cases.  Additionally, EAC-South continues to play a critical role in ensuring equitable access to education for all students by remaining true to its civil rights roots of "provid[ing] technical assistance and training at the request of school boards and other responsible governmental agencies in the preparation, adoption, and implementation of plans for the desegregation of public schools."[3]

32.    The Secretary of Education is responsible for competitively selecting eligible grantees for the EACs across the United States. 42 U.S.C. 2000c(a); 34 C.F.R. § 270.4. The technical assistance provided by such projects must involve the desegregation of public schools in the areas of race, sex, national origin, and religion. 42 U.S.C. 2000c(b); 42 U.S.C. 2000c-2; 34 C.F.R. §§ 270.4 and 270.7.

**C.  Notice and Comment Rulemaking Procedures Required for Agency Priorities.**

33.    Federal statutes and regulations, 20 U.S.C. 1234d and 34 C.F.R. Part 81, govern the procedural requirements and substantive basis for the Department ending an EAC grant during a budget period. *See also* 2 C.F.R. 200.340.

34.    The Secretary of Education (the "Secretary") is required to publish agency priorities ("Priorities") in the Federal Register, which must be used to select the more specific priorities for an award competition and must have gone through public comment, unless one of the following exceptions apply:

---

[3] *Training and Advisory Servs. – Equity Assistance Centers*, U.S. Dep't of Educ., https://www.ed.gov/grants-and-programs/grants-birth-grade-12/training-and-advisory-services--equity-assistance-centers (last visited Apr. 9, 2025).

> (i)    The final annual priorities will be implemented only be inviting applications that meet the priorities;
> (ii)   The final annual priorities are chosen from a list of priorities already established in the program's regulations;
> (iii)  Publishing proposed annual priorities would be impracticable, unnecessary, or contrary to the public interest;
> (iv)   The program statute requires or authorizes the Secretary to establish specified priorities; or
> (v)    The annual priorities are chosen from allowable activities specified in the program statute.

34 C.F.R. § 75.105(b)(2).

35.    The Secretary is likewise required to establish the specific priorities that are included in the application for each competitive federal grant program, such as the program for EACs, by publishing the priorities in the Notice Inviting Applications for the grant in the Federal Register. 34 C.F.R. § 75.105(b)(1).

36.    As a federal agency, the Department is unique in the statutory requirement it must follow for setting agency Priorities for discretionary grants. While the APA exempts grants from the rulemaking process (*see* 5 U.S.C. § 553(a)(2)), the General Education Provisions Act (20 U.S.C. § 1232(d)) ("GEPA") states that, for the Department, the grants exemption for rulemaking only applies to regulations "(1) that govern the first grant competition under a new or substantially revised program authority as determined by the Secretary; or (2) where the Secretary determines [rulemaking] will cause extreme hardship to the intended beneficiaries of the program affected by such regulations."

37.    In other words, the Priorities for grant programs administered by the Department must go through the notice and comment rulemaking process, unless one of the above exceptions in 20 U.S.C. § 1232(d) applies. *See Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*, --- F. Supp. 3d ----, 2025 WL 833917, at *21 (D. Md. Mar. 17, 2025).

**D. Department of Education Priority Applicable to the Now-Terminated Equity Assistance Centers Grant.**

38.    After going through the proper notice and comment rulemaking process, the Department published its Notice of Final Priority and Requirement for EACs in the Federal Register on July 18, 2016. The final Priority states: "a track record of success or demonstrated expertise in developing or providing technical assistance to increase socioeconomic diversity in schools or school districts as a means to further desegregation by race, sex, national origin, and religion." 81 F.R. 46817-46819.

39.    Then, after going through the proper notice and comment rulemaking process, the Department published a Notice of Final Priority for discretionary grant programs in the Federal Register on November 27, 2019. 84 F.R. 65300-65303. The Department published a Notice of Final Priorities for all discretionary programs in the Federal Register on March 9, 2020, after following a subsequent notice and comment rulemaking process. 85 F.R. 13640-13644.

40.    Finally, the Department published a Notice of Final Priorities for the Secretary's Supplemental Priorities for all discretionary grant programs in the Federal Register on December 10, 2021.  The final supplemental Priorities consisted of the following: Priority 1—Addressing the Impact of COVID-19 on Students, Educators, and Faculty; Priority 2—Promoting Equity in Student Access to Educational Resources and Opportunities; Priority 3—Supporting a Diverse Educator Workforce and Professional Growth to Strengthen Student Learning; Priority 4—Meeting Student Social, Emotion, and Academic Needs; Priority 5—Increasing Postsecondary Education Access, Affordability, Completion, and Post-Enrollment Success; and Priority 6—Strengthening Cross-Agency Coordination and Community Engagement to Advance Systemic Change.  86 F.R. 70612-70641.

**E. Notice Inviting Applications for FY2022 Equity Assistance Centers Grant.**

41.     On February 15, 2022, the Department published a Notice Inviting Applications for the FY2022 EAC competition, inviting applicants to apply for the grant funds. 87 F.R. 8564-8570.

42.     The project period for the FY2022 competition, the maximum amount of time for which the grant can be awarded, was for a period of five years. 87 F.R. 8567. The EAC competition included the following Priority: Promoting Equity Through Diverse Partnerships.  87 F.R. 8566.

**F. The Department of Education Award of a Federal Grant to SEF for the Equity Assistance Center.**

43.     SEF applied for a grant to operate the EAC for Region II on May 16, 2022 (the "Application").

44.     As part of the Application, SEF outlined their five-year plan for the funding, indicating milestones they expected to reach annually. A core part of this five-year plan related to the implementation of targeted and intensive technical assistance to public schools in the region with a specific focus on the active school desegregation cases in federal courts. The targeted technical assistance would support educators in revising policies and practices to ensure high-quality educational opportunities for *all* students. The intensive technical assistance would aim to sustain such policies and practices to resolve persistent issues related to school desegregation. The milestones for the technical assistance program through the EAC-South include: partner with federal, state, and local officials and school boards to assess the needs of public schools in the region; make resources accessible and available to public schools through their website and partner organizations; conduct webinars, modules, and simulations for educators across schools; host virtual sessions on the challenges affecting the region; host local education agencies through targeted technical assistance initiatives and provide virtual coaching sessions; and design and support programs that will enable the sustainability of programs and initiatives implemented through technical assistance to achieve unitary status for all students.

45.     In October 2022, the Department awarded SEF a five-year grant, totaling $8.6 million (S004D220011), to operate EAC-South. The grant is the sole source of funding for EAC-South. SEF received the initial Grant Award Notification ("GAN #1"), stating details for the initial grant, budget periods and additional compliance provisions. GAN #1 is attached as **Exhibit B.**

46.     Since receiving the grant in 2022, SEF has spent considerable time and resources towards assembling high-quality content and content providers necessary to address the unique issues of the southern region and its high volume of active school desegregation cases.  SEF has extended its historic brand and credibility toward forming a collaborative network to bring real focus and resolution to the longstanding and disruptive legacy of racial segregation in public education in the southern states.

47.     SEF, through EAC-South, has provided free services to public schools within its region, including professional development of teachers to train them on, *inter alia*, improving student attendance and engagement; tailored support to schools, consulting on district goals and challenges geared toward improving student equity; resources on retaining teachers and fostering an supportive environment for all students to succeed; and other services related to addressing elements of segregation in public education.

**G.  The DEI-Focused Executive Orders and Directive from the Executive Branch.**

48.     Within hours of assuming the office of the President of the United States on January 20, 2025, President Trump signed Executive Order 14151, titled "Ending Radical and Wasteful Government DEI Programs and Preferencing" ("Executive Order 14151").

49.     The stated purpose and policy of Executive Order 14151 is to reverse the Biden Administration's "forced illegal and immoral discrimination programs, going by the name

'diversity, equity, and inclusion' (DEI), into virtually all aspects of the Federal Government."
Executive Order 14151, § 1.

50.     Executive Order 14151 directed Trump Administration officials, consisting of the
Director of the OMB, the Attorney General of the United States, and the Director of the Office of
Personnel Management, to "coordinate the termination of all discriminatory programs, including
illegal DEI and 'diversity, equity, inclusion, and accessibility' (DEIA) mandates, policies,
programs, preferences, and activities in the Federal Government." Executive Order 14151, § 2(a).

51.     Executive Order 14151 further directed that each agency head "shall . . . terminate.
. . all 'equity action plans,' 'equity' actions, initiatives, or programs, [and] 'equity-related' grants
or contracts." Executive Order 14151, § 2(b). Agency heads were asked to provide OMB with a
list of all federal grantees who received funding to provide or advance DEI. Executive Order
14151, § 2(b)(ii).

52.     The next day, on January 21, 2025, President Trump signed Executive Order 14173,
titled "Ending Illegal Discrimination and Restoring Merit-Based Opportunity" ("Executive Order
14173"). This Executive Order repeats Executive Order 14151, declaring that diversity, equity,
inclusion, and accessibility programming "can violate the civil-rights laws of this Nation."
Executive Order 14151, § 1.

53.     In Executive Order 14173, signed on January 21, President Trump mandated "all
executive departments and agencies [ ] to terminate all discriminatory and illegal preferences,
mandates, policies, programs, activities, guidance, regulations, enforcement actions, consent
orders, and requirements." Executive Order 14173, § 2.

54.     Neither Executive Order (together the "DEI Executive Orders") defines what
constitutes "DEI," "equity-related," "equity action plans," "equity actions, initiatives, or

programs," or "DEIA." Nor do they provide any guidance as to what mandates, policies, programs, activities, guidance, regulations, enforcement actions, consent orders, grants, or contracts are considered unlawful diversity, equity, inclusion, and accessibility initiatives, "promoting DEI," "illegal DEI," or "illegal discrimination or preferences."

55.     On January 27, 2025, OMB further issued a memorandum, ordering federal agencies to pause federal funding and undertake a review of federal programs for compliance with the Trump Administration's policies and requirements ("OMB Directive"). This memorandum was quickly rescinded by OMB, two days later, with the White House Press Secretary clarifying that the rescission of the memorandum does not affect the federal funding freeze.

**H.  The Department of Education's Termination of SEF's Federal Grant.**

56.     On February 13, 2025, less than one month after the release of the DEI Executive Orders, the Department announced the termination of grants to the four EACs for their alleged support of divisive training in DEI, among other things (the "February 13th Press Release"). The February 13th Press Release is attached as **Exhibit C** to this Complaint.

57.     The same day, SEF received a letter from the Department stating that the grant SEF had relied upon since 2022 was now allegedly inconsistent with the priorities of the Department and therefore terminated (the "Termination Letter"). The Termination Letter is attached as **Exhibit D**. Later that day, SEF received a Grant Award Notification ("GAN #2"), from the Department's G6 grants administration system, noting the Center's grant award was terminated, effective February 13, 2025, and the subsequent grant years were removed from the award notice. GAN #2 is attached as **Exhibit E.**

58.     The Termination Letter stated that "[i]t is a priority of the Department to eliminate discrimination in all forms of education throughout the United States," and that "this priority

includes ensuring that the Department's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic."

59.    The Termination Letter goes further to characterize the funding that supported the EAC-South as "promot[ing] or tak[ing] part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic; that violate either the letter or purpose of Federal civil rights law; that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; . . . or that otherwise fail to serve the best interests of the United States."

60.    The Termination Letter also does not define diversity, equity, and inclusion or describe how the programs and initiatives are contrary to the Department's priorities and policies under the Trump Administration.

61.    In the Termination Letter, the agency did not state whether the EAC-South was failing to comply substantially with the law. It did not provide a factual and legal basis for such an allegation. It did not provide an opportunity for a hearing to be held on a date at least 30 days after the notification was sent.

62.    The Termination Letter cites 34 C.F.R. § 75.253, "Continuation of a multiyear project after the first budget period," presumably as it relates to decisions not to make continuation awards. 34 C.F.R. § 75.253(f). But 34 C.F.R. § 75.253 applies where the agency is determining, after the completion of the grantee's first budget period, whether to grant funds for the subsequent budget period. "The new budget period begins on the day after the previous budget period ends." 34 C.F.R. § 75.253(d).

63.    34 C.F.R. § 75.253 does not apply to termination of grants mid-budget period.

64.    EAC-South was in the middle of the FY2024 budget period when it received the Termination Letter. The Center received its first grant on September 26, 2022, for the FY22 budget period, ending on September 30, 2023. The Center received its second grant on July 20, 2023, for the FY23 budget period, ending on September 30, 2024. Finally, the Center received its third grant for the FY24 budget period, which ends on September 30, 2025.

65.    On February 17, 2025, the Department followed up with another public announcement on the termination of grants, explaining that the grants were allegedly the result of using taxpayer funds to train teachers and education agencies on divisive ideologies, such as "Diversity, Equity, and Inclusion" and "equity training" (the "February 17th Press Release," and together with the February 13th Press Release, the "DOE Press Releases")—as argued in the Department's previous statement and the Termination Letter. The February 17th Press Release is attached as **Exhibit F**.

66.    While the GAN #2 and Termination Letter did not reference Executive Order 14151 as the reason for terminating the grant, the Department's press releases create an undeniable causal connection between the EAC grant termination and the Termination Provision in Executive Order 14151 requiring the Department to terminate "equity-related" grants or contracts.

**I.   General Education Provisions Act Enforcement Requirements Apply to The Equity Assistance Center Grants.**

67.    The General Education Provisions Act ("GEPA") enforcement provisions that allow for terminating a grant during a budget period, 20 U.S.C. § 1234d and for implementing regulations at 34 C.F.R. Part 81, apply to the EACs. The EACs are an "applicable program" for which the Secretary or the Department has administrative responsibility as provided by law. 20 U.S.C. § 1234i; 34 C.F.R. Part 81; 34 C.F.R. 270.6.

68.    The Department is required to use the Congressionally mandated GEPA procedures to end an EAC grant in the middle of a budget period because GEPA provides statutory remedies and procedural protections for grantees. The Department does not have the discretion to bypass GEPA procedures and substantive standards, nor can it apply Executive Branch-made procedures and standards from 2 C.F.R. Part 200, even if it prefers those procedures.

69.    GEPA provides for withholding funds from a grantee when the grantee "is failing to comply substantially with any requirement of law applicable to such funds." 20 U.S.C. § 1234c(a); 34 C.F.R. 81.3. This is the substantive standard that must be met to end an EAC grant during a budget period.

70.    GEPA outlines the process required for the Secretary to withhold funds in such circumstances. First, the Secretary must notify the grantee, in writing, of (1) intent to withhold payments, (2) "the factual and legal basis for the Secretary's belief that the [grantee] has failed to comply substantially with a requirement of law," and (3) "an opportunity for a hearing to be held on a date at least 30 days after the notification has been sent to the [grantee]." 20 U.S.C. § 1234d(b); 34 C.F.R. 81.

71.    GEPA states that the Secretary may suspend payments to a grantee only "after the [grantee] has been given reasonable notice and an opportunity to show cause why future payments [. . .] should not be suspended." 20 U.S.C. § 1234d(d).

72.    GEPA withholding and suspension procedures permit the Department to end an EAC grant in the middle of a budget period, i.e., to terminate the grant, as a remedy for the grantee's failure "to comply substantially with any requirement of law applicable to such funds." 20 U.S.C. § 1234c(a).

73.     GEPA does not allow the Department–as it has done here–to bypass Congressionally mandated substantive and procedural requirements for "applicable programs" and end a grantee's ability to draw down obligated funds in the middle of a budget period. Using grant termination procedures outlined in 2 § C.F.R. 200.340 simply because the grant does not align with agency priorities is not the lawful method of grant termination here.

74.     In the alternative, even if GEPA does not apply (e.g., if a court finds that EACs are grant programs excluded from the definition of "applicable programs" for the purposes of Part D of GEPA, 20 U.S.C. § 1234(i)), the Termination Letter fails to satisfy even the procedures in 2 C.F.R. § 200.340.

**J. The Adverse Impact of the Grant Termination on SEF.**

75.     Termination of SEF's EAC grant has unlawfully deprived SEF of the sole source of funding for EAC-South, which, without Court intervention, has and will continue to cause immediate and irreparable harm to EAC-South and those school districts and students that it serves.

76.     The loss of funding is economic harm so significant that it threatens the very existence of EAC-South and its ability to provide critical assistance to schools and school districts.

77.     The loss of funding will not only end SEF's ability to address ongoing desegregation efforts and educational issues throughout the South but also exacerbate the inequities and lack of access to high-quality education and schools throughout the region and country.

78.     At the time of this filing, there are 132 school districts under active desegregation orders across the United States, and 130 of those schools and school districts fall in the EAC-South's region. EAC-South helps those school districts on an as-requested basis. Since 2022, EAC-South has received requests for help from five districts under active desegregation orders and four

districts with active civil rights complaints. As of February 13, 2025, EAC-South was actively helping eight of them in response to their requests for assistance.

79.    At the time of this filing, EAC-South is providing critical technical assistance to Fayette County Public Schools ("FCPS"), in Tennessee, which has remained under a federal desegregation order since 1965. With EAC-South's expert assistance, FCPS achieved partial unitary status, as determined by a federal court, and the district continues to make substantial progress toward full compliance. EAC-South's staff spent considerable time and effort to support FCPS through this process. Moreover, EAC-South is working with an Arkansas school district, under a current Civil Rights Resolution, to establish equal access to gifted and advanced placement programs for all students.

80.    However, as a result of the boilerplate Termination Letter and the Department's refusal to fund EAC-South, SEF is currently unable to operate EAC-South. It cannot provide vital assistance to schools and school districts seeking to resolve federal desegregation orders, therefore hindering SEF's ability to fulfill its mission and the mission of EAC-South which flow directly from the anti-discrimination mandates of *Brown* and the Civil Rights Act of 1964.

81.    By halting EAC-South's operations, the Department has denied school districts access to critical, federally authorized technical assistance services that they have actively sought to address compliance with civil rights obligations. EAC-South is the only center of its kind in the region. It is uniquely positioned to provide expert support at no cost to school districts—regardless of a district's resources. The removal of this federally funded assistance imposes a significant financial burden on school districts, which could be highly cost prohibitive, thereby causing substantial and irreparable harm to their ability to serve all students equitably.

82.     The termination of the EAC-South grant will result in the loss of employment for the dedicated staff and partners who ensure EAC-South run daily. The time and resources it will take for EAC-South to recover from the loss of these experienced and specially trained staff members is uncertain.

83.     SEF has suffered actual and immediate harm due to the February 2025 termination of funding, which forced SEF to shut down EAC-South in the middle of the program year. This sudden disruption caused and continues to cause irreparable harm to SEF, and to the school districts and students who rely on EAC-South for civil rights support.

84.     SEF will suffer loss of goodwill and injury to reputation with the school districts they service through EAC-South. School districts rely upon SEF and EAC-South for assistance involving compliance with desegregation orders. If school districts cannot rely on this assistance during the middle of a grant period, they will be forced to look for services elsewhere.

85.     In addition to its operation of EAC-South, SEF also undertakes other operations in furtherance of improving education for public school students across the Southern U.S. If school districts cannot rely on SEF and EAC-South to help them comply with desegregation orders, school districts across the Southern United States will no longer view SEF as a reliable organization to further such goals.

86.     In short, this unexpected grant termination threatens to destroy the reliability and goodwill that SEF and EAC-South have been developing in the southern public education system for a century and a half. Although the economic realities of the grant termination also threaten EAC-South and SEF's existence, the existential threats go beyond monetary harm—they jeopardize their hard-earned reputation.

87.    Since the termination went into effect on February 13, 2025, SEF has not received pending payments of $78,960.83 owed to it by the Department.  Additionally, as of February 13, 2025, the Department had not paid SEF expenses for services rendered prior to the termination, which total $214,720.95.

88.    The termination of the grant will result in a $1,924,031.96 annual loss to SEF, including total outstanding payments of $293,681.78 for the current EAC-South program. Additionally, the termination of the grant will result in $3,371,108 overall loss, including the remaining two budget periods of a year each.

89.    The Termination Letter provided that SEF may challenge the decision by submitting information documenting their position in writing to the Department within thirty days of the termination. However, the letter failed to provide any guidance regarding the process or timeline for the Department's response, creating further uncertainty and depriving SEF of the ability to meaningfully exercise any right to challenge the termination.

90.    SEF timely submitted an appeal to the Acting Assistant Secretary for the Office of Elementary and Secondary Education in line with procedures outlined in the Termination Letter. SEF's appeal was submitted on March 11, 2025.  However, the termination of SEF's EAC-South already went into effect on February 13, 2025, causing immediate harm. Since that date, the Department has not provided any funding in connection with this grant to SEF.

91.    Moreover, the Termination Letter does not provide for a timeframe by which the Department is obliged to make a determination regarding an appeal.  An indeterminate duration for an appeal deprives SEF of critical funding needed to avoid further continued suspension of activities undertaken by the EAC-South.

92.    On May 16, 2025, SEF withdrew its appeal to the Department by way of a letter sent electronically and through first-class mail.

93.    On May 14, 2025, the Department of Education remitted an electronic payment of $293,681.78 for outstanding expenses incurred by SEF on or before February 13, 2025. In spite of this payment, the grant remains terminated by ED. In addition to the unlawful actions concerning SEF's grant termination, the Department also added a special condition to the grant after it was terminated, requiring prior approval to draw down funds. This special condition is referred to as "route pay."

94.    Generally, unless a grantee poses a specific risk, they can draw down funds from their grant award based on allowable, allocable and reasonable costs approved in the budget without prior approval.

95.    SEF is eligible for costs that were properly incurred before the termination date and costs that would not have occurred if the grant was not terminated. As a grantee, SEF has 120 days to draw down funds after the termination date. 2 C.F.R. §§200.343, 200.472, 200.344(b).

96.    The imposition of a special condition on a grant, such as establishing additional prior approvals, can only be done if the grantee is determined to pose a risk.

97.    The rule states that before conditions are put in place, the agency has to notify the grantee as to: (1) the nature of the additional requirements; (2) the reason why the additional requirements are being imposed; (3) the nature of the action needed to remove the additional requirement, if applicable; (4) the time allowed for completing the actions if applicable; and (5) the method for requesting reconsideration of the additional requirements imposed. 2 C.F.R. §208.

98.     Without notice, the Department put a blanket condition on the terminated grant to require prior approval for all drawdowns. This condition was not listed on the grant prior to the February 13th termination.

99.     This new, unlawfully imposed condition has caused delays in SEF receiving its grant funds and added subjectivity to already-incurred costs.

100.     Therefore, the placement of SEF grant on route pay was also unlawful.

101.     The APA waives the federal government's sovereign immunity to permit judicial review of agency action in limited circumstances. 5 U.S.C. § 705. Importantly, judicial review is limited to "final agency action for which there is no other adequate remedy in a court." *Id.; accord Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*, --- F. Supp. 3d ----, 2025 WL 833917, at *21 (D. Md. Mar. 17, 2025) (same). Agency action is "final" when two conditions are met: (1) "the action must mark the 'consummation' of the agency's decision-making process – it must not be of a merely tentative or interlocutory nature," and (2) "the action must be one by which 'rights or obligations have been determined,' of from which 'legal consequences will flow,'" *Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*, --- F. Supp. 3d ----, 2025 WL 833917, at *21 (D. Md. Mar. 17, 2025) (quoting *Biden v. Texas*, 597 U.S. 785, 808 (2022)).

102.     Absent Court intervention, and regardless of SEF's appeal of the Department's termination of the grant, in contravention to Title IV of the Civil Rights Act of 1964 and the Supreme Court's ruling in *Brown I* and *Brown II*, SEF will be forced to permanently shut down EAC-South, causing greater harm to all parties.

103.     SEF seeks emergency injunctive relief by directing the Department to return the Grant to the *status quo ante* and rescind the termination of its grant.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

***Violation of the APA—Unlawful Suspension of Grants (Arbitrary and Capricious Decision)***

**(Against Defendants Department of Education, Secretary Linda McMahon)**

104.    All preceding paragraphs are incorporated herein by reference.

105.    The APA authorizes this Court to hold unlawful and set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise is in accordance with law" and to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1), (2)(A).

106.    Defendants' termination of SEF's grant constitutes final agency action under the APA.

107.    The Department failed to provide reasoned decision-making for terminating the EAC-South grant and SEF's grant in its February 13th Press Release and Termination Letter.

108.    The February 13th Press Release fails to explain how EAC-South grants "supported divisive training in DEI, Critical Race Theory, and gender identity."

109.    The February 13th Termination Letter failed to explain how the EAC-South grant constituted a program or initiative promoting or taking part in DEI initiatives or defining "diversity, equity, and inclusion" and "illegal DEI."

110.    The Department failed to account for the fact that EAC-South does not constitute DEI. The Center focuses on providing technical assistance to public schools in the South *regardless of* race, color, religion, sex, or national origin, in line with 42 U.S.C. § 2000c.

111.    Additionally, the Department terminated the grant because it "is inconsistent with, and no longer effectuates, Department priorities," which is contrary to statute and regulation and arbitrary and capricious.

112.    Moreover, the Termination Letter is nearly identical to the termination letters received by the EACs serving the other regions, further suggesting a lack of reasoned decision-

making in the Department's termination of SEF's grant. *See Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*, --- F. Supp. 3d ----, 2025 WL 833917, at *21 (D. Md. Mar. 17, 2025) ("the Department's use of a template or boilerplate letter issued to all Grant Recipients further strengthen[ed] Plaintiffs' argument that the Department did not consider individual, or any, data or information.").

113.    In all, Defendants' termination of SEF's grant was arbitrary and capricious.

## SECOND CAUSE OF ACTION

### *Violation of the APA—Unlawful Suspension of Grants (Failure to Comply With Notice and Comment Rulemaking Procedures)*

### (Against All Defendants)

114.    All preceding paragraphs are incorporated herein by reference.

115.    The APA authorizes this Court to hold unlawful and set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise is in accordance with law" and to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.SC. § 706(1), (2)(A).

116.    Defendants' termination of SEF's grant constitutes final agency action under the APA.

117.    Federal statutes and regulations, 20 U.S.C. 1234d and 34 C.F.R. Part 81, govern the procedural requirements and substantive basis for the Department ending an EAC grant during a budget period. *See also* 2 C.F.R. 200.340.

118.    The Secretary is required to publish Priorities in the Federal Register, which must be used to select the more specific priorities for an award competition and must have gone through public comment, subject to certain exceptions not applicable here. 34 C.F.R. § 75.105(b)(2); 20 U.S.C. § 1232(d).

119.    The Secretary is likewise required to establish the specific priorities that are included in the application for each competitive federal grant program, such as EACs, by

publishing the priorities in the Notice Inviting Applications for the grant in the Federal Register. 4 C.F.R. § 75.105(b)(1).

120.    The Department is unique in the statutory requirement it must follow for setting agency Priorities for discretionary grants.  While the APA (5 U.S.C. § 553) exempts grants from the rulemaking process, GEPA (20 U.S.C. § 1232(d)) states that, for the Department, the grants exemption for rulemaking only applies to regulations (1) that govern the first grant competition under a new or substantially revised program authority as determined by the Secretary; or (2) where the Secretary determines rulemaking will cause extreme hardship to the intended beneficiaries of the program.

121.    The Priorities for the grant programs administered by the Department must go through the notice and comment rulemaking process, unless one of the aforementioned exceptions apply. *See Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*, --- F. Supp. 3d ----, 2025 WL 833917, at *21 (D. Md. Mar. 17, 2025).

122.    None of the exceptions applies; the Department is required to go through notice and comment rulemaking to change its Priorities. *See Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*, --- F. Supp. 3d ----, 2025 WL 833917 (D. Md. Mar. 17, 2025).

123.    The Department did not go through notice and comment rulemaking to change its Priorities. As a result, and contrary to the Department's officially stated reasons, the current Priorities remain Department Priorities, and the EAC-South grant remains consistent with the Department's Priorities.

124.    Therefore, the Department's termination of SEF's grant funds is a violation of the Administrative Procedure Act and an unlawful suspension of grants.

### THIRD CAUSE OF ACTION

*Violation of the APA—Failure to Comport with Due Process Procedures*

**(Against Defendants Department of Education, Secretary Linda McMahon)**

125.    All preceding paragraphs are incorporated herein by reference.

126.    GEPA applies to the EAC Program. *See* 20 U.S.C. § 1221(c)(1). The procedures outlined in that statute govern termination of EAC grants.

127.    34 C.F.R. § 75.253 does not apply to termination of grants mid-budget period and thus does not apply to the EAC-South grant termination. Rather, 34 C.F.R. § 75.253 applies when making continuation grant decisions for future budget periods. *See also Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*, --- F. Supp. 3d ----, 2025 WL 833917 (D. Md. Mar. 17, 2025).

128.    20 U.S.C. § 1234c(a) requires that for an agency to withhold funds from a grantee, the grantee must be "failing to comply substantially with any requirement of law applicable to such funds." 20 U.S.C. § 1234c(a).

129.    20 U.S.C. § 1234d(b) requires that, to withhold funds, the Secretary must notify the grantee, in writing, of  (1) intent to withhold payments, (2) "the factual and legal basis for the Secretary's belief that the [grantee] has failed to comply substantially with a requirement of law," and (3) "an opportunity for a hearing to be held on a date at least 30 days after the notification has been sent to the [grantee]." 20 U.S.C. § 1234d(b).

130.    Only after "the agency has given reasonable notice and an opportunity for the grantee to demonstrate why future payments should not be suspended" can an agency withhold funds. 20 U.S.C. § 1234d(d).

131.    GEPA does not allow the agency to terminate a grant because the grant does not align with agency priorities.

132.    EAC-South has not failed to comply substantially with any part of the law applicable to the program.

133.    The Department did not provide a factual or legal basis for its belief otherwise.

134.    The Department did not provide reasonable notice or an opportunity to be heard before withholding funds.

135.    Defendants' termination is contrary to law in violation of the APA.

## FOURTH CAUSE OF ACTION

### *U.S. Const., Fifth Amendment—Due Process (Vagueness)*

### (Against All Defendants)

136.    All preceding paragraphs are incorporated herein by reference.

137.    A governmental enactment, including an executive order, is unconstitutionally vague under the Fifth Amendment to the United States Constitution where "it fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008).

138.    The Termination Provision of Executive Order 14151 "fails to provide a person of ordinary intelligence fair notice of what is prohibited" and "is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Id.*

139.    Executive Order 14151 fails to define key terms, such as "DEI," "DEIA," "equity," or "equity-related," and thus fails to satisfy the minimum requirements of the Constitution.

140.    The Termination Provision of Executive Order 14151 fails to distinguish between "Desegregation" targeted by Title IV of the 1964 Civil Rights Act and "DEI", "DEIA," "equity," or "equity-related," and thus fails to satisfy the minimum requirements of the Constitution.

141.    The Termination Letter was issued pursuant to the Termination Provision of Executive Order 14151 (§ 2(b)(i)).

142.    SEF was subjected to the Termination Provision of Executive Order 14151 upon receipt of the Termination Letter and the resulting termination of their EAC-South grant.

143.    SEF has been deprived of constitutionally guaranteed rights to due process in the termination of the EAC-South grant.

144.    Executive Order 14151 and the Termination Letter "[fail] to provide a person of ordinary intelligence fair notice of what is prohibited," by failing to define "DEI" initiatives or describe the elements of EAC-South or any program receiving federal grants which it deems to violate anti-discrimination laws.

145.    EAC-South is a Civil Rights Act-authorized school desegregation program. If its services are deemed to be "unlawful discrimination the basis of race […] or other protected characteristic," as described in the Termination Letter, no "person of ordinary intelligence" could possibly understand what programs are not prohibited by Executive Order 14151 or the Termination Letter.

146.    Thus, Executive Order 14151 and the Termination letter are effectively standardless, leaving them vulnerable to discriminatory enforcement.

## FIFTH CAUSE OF ACTION

### *Violation of Title VI of the Civil Rights Act of 1964 – Failure to Comply with 42 U.S.C. § 2000d-1*

### (Against All Defendants)

147.    All preceding paragraphs are incorporated herein by reference.

148.    The Department seems to allege that the EAC-South grant violates Title VI of the Civil Rights Act of 1964.

149.    42 U.S.C. § 2000d provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits

of, or be subjected to discrimination under any program or activity receiving Federal financial

assistance."

150.    The Termination Letter states that SEF's grant "provides funding for programs

that promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the

basis of race, color, religion, sex, national origin, or another protected characteristic" and "that

violate either the letter or purpose of Federal civil rights law." *See* **Exhibit D.**

151.    42 U.S.C. § 2000d-1 requires that federal grants the Department deems

noncompliant cannot be terminated "until the department or agency concerned has advised the

appropriate person or persons of the failure to comply with the requirement and has determined

that compliance cannot be secured by voluntary means."

152.    Further, 42 U.S.C. § 2000d-1 provides that "[i]n the case of any action

terminating, or refusing to grant or continue, assistance because of failure to comply with a

requirement imposed pursuant to this section, the head of the Federal department or agency shall

file with the committees of the House and Senate having legislative jurisdiction over the program

or activity involved a full written report of the circumstances and the grounds for such action."

Terminations are not effective until thirty days after filing said report. 42 U.S.C. § 2000d-1.

153.    The Department did not advise SEF of the failure to comply with any requirement

prior to its termination of the EAC-South grant.

154.    The Department did not determine that compliance could not be secured through

voluntary means.

155.    To SEF's knowledge, the Department did not file with the pertinent House and

Senate committees a full written report of the circumstances and grounds for termination.

156.    Defendants' termination is contrary to law in violation of the APA.

### SIXTH CAUSE OF ACTION

### *Ultra Vires – Impoundment of Congressionally Appropriated Funds*
### (Against All Defendants)

157.    All preceding paragraphs are incorporated herein by reference.

158.    SEF has a non-statutory right of action to seek an injunction against unlawful official action that is ultra vires. *See Chamber of Commerce v. Reich*, 74 F.3d 1322, 1327-8 (1996).

159.    This Court has inherent equitable power to enjoin executive conduct that violates the Constitution. *See Free Enterprise Fund v. Public Company Accounting Oversight Bd.*, 561 U.S. 477, n.2 (2010*)*. And "the President's actions may ... be reviewed for constitutionality." *Franklin v. Massachusetts*, 505 U.S. 788 (1992) (citations omitted).

160.    Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-7 (2015). The Supreme Court has thus allowed equitable relief against federal officials who act "beyond th[e] limitations" imposed by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

161.    The President and the Department lack the authority to immediately and categorically terminate grant funding that has been appropriated by Congress, based on a policy disagreement with aggregate spending levels set by Congress or to reorder spending priorities inconsistent with congressional budgetary determinations.

162.    Indeed, the Executive Branch itself has long recognized that "the suggestion that the President has the constitutional power to decline to spend appropriated funds … is supported by neither reason nor precedent." *Presidential Authority to Impound Funds Appropriated for*

*Assistance to Federally Impacted Schools*, 1 Supp. Op. O.L.C. 303, 309 (1969) (Rehnquist, A.A.G.).

163.    The United States Supreme Court in *Brown v. Board of Education* ruled that segregation in public education is unconstitutional. *Brown v. Bd. of Ed. of Topeka, Shawnee Cnty., Kan.*, 347 U.S. 483 (1954), *supplemented sub nom. Brown v. Bd. of Educ. of Topeka, Kan.*, 349 U.S. 294 (1955).

164.    The United States Congress enacted Title IV of the Civil Rights Act of 1964 to carry out the *Brown v. Board of Education* ruling. The Department's termination of SEF's grant undermines the Title IV of the 1964 Civil Rights Act and the Supreme Court's ruling in *Brown v. Board of Education*.

165.    The Take Care Clause forbids the President from refusing to faithfully execute the laws of the United States, including spending laws. *See id.* at 311.

166.    The Appropriations Clause states that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7.

167.    The Appropriations Clause was designed to "assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 428 (1990).

168.    The Impoundment Control Act of 1974, 2 U.S.C. §§ 681 *et seq.*, circumscribes the Executive Branch's authority to categorically terminate or modify obligated grant funding. The Impoundment Control Act permits the Executive Branch to impound (*i.e.*, decline to spend) federal funds only under narrow circumstances. 2 U.S.C. §§ 683, 684.

169.    The Impoundment Control Act does not permit the Executive Branch to defer appropriated funds based on policy disagreements with congressional priorities, *id.* § 684(b), nor to rescind funds without Congressional approval, *id.* § 683.

170.    The President has not transmitted a special message to Congress requesting that the funding associated with terminated grants be rescinded or deferred, and Congress has not rescinded any such appropriations.  The President is thus required by the Impoundment Control Act to expend the appropriated funding.

171.    Defendants have committed extreme error and have stepped so plainly beyond the bounds of their statutory authority, or acted so clearly in defiance of it, as to warrant the immediate intervention of an equity court.

172.    Defendants have patently misconstrued the APA such that they disregard a specific and unambiguous statutory directive.

## SEVENTH CAUSE OF ACTION

### *First Amendment to the United States Constitution (Free Speech Clause)*
### (Against All Defendants)

173.    All preceding paragraphs are incorporated herein by reference.

174.    "Discrimination against speech because of its message is presumed to be unconstitutional." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995). "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Id*.

175.    This restriction applies to government grantees. *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc*., 570 U.S. 205, 214-15 (2013). The government may not impose limitations on grantees based on viewpoint. *Id*.

176.    The Termination Letter makes several overly broad and vague allegations regarding SEF's grant: (1) that it "provides funding for programs that promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic," (2) that the grant provides funding for programs that otherwise "violate either the letter or purpose of Federal civil rights law," or (3) that the grant provides funding for programs "that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education."

177.    The Termination Letter then states that SEF's grant "is therefore inconsistent with, and no longer effectuates, Department priorities." See **Exhibit D**.

178.    The Department's termination of SEF's grant constitutes viewpoint discrimination.

179.    The Executive Order 14151 and Termination Letter constitute content-based regulations of speech because they discourage federal grantees from expressing support for, conducting academic research relating to, or for in any way speaking about initiatives that create equitable educational environments for all students, regardless of race.

180.    In particular, the failure to define prohibited "DEI initiatives" simultaneously with the sudden punishment of grant termination chills the speech of federal grantees, including SEF and EAC-South, who engage in protected speech activities.

181.    The Department failed to define "DEI initiatives" and failed to specify how SEF's grant funds programs that discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic.

182.    The Department's actions target SEF's speech and expressive conduct; specifically, EAC-South's technical assistance, including its trainings and written work product that contain

terms and references to creating equal access to educational opportunities, authorized by Title IV of the Civil Rights Act of 1964 to carry out the Supreme Court decision in *Brown*.

183.    The Department's grant termination targets and aims to suppress a particular viewpoint that promotes the value of providing equitable educational opportunities, rather than targeting all viewpoints on the subject matter of educational equity equally, for example, by also targeting programs that advocate against "diversity," "equity," or "inclusion."

184.    Defendants' conduct with respect to SEF's grant termination threatens to chill SEF and other grantees' speech; it stigmatizes SEF and EAC-South based on their viewpoint by denouncing their work as discriminatory and unlawful; jeopardizing their trust with the communities they serve and damaging their reputation; and it denies EAC-South access to federally authorized funding based solely on its perceived association with a particular viewpoint.

185.    Defendants' termination is contrary to First Amendment protections under the Constitution.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, the Plaintiff respectfully requests the Court:

a.    Declare unlawful and set aside Defendants' termination of the EAC-South grant;

b.    Declare unlawful and set aside Defendants' action placing Plaintiff's grant on route pay;

c.    Order a temporary restraining order and preliminary and a permanent injunction order (a) enjoining the Defendants from enforcing the Termination Provision of Executive Order 14151 and the February 13, 2025, termination letter sent to the Plaintiff from the Department; (b) ordering such grant funding reinstated forthwith; and (c) ordering the Defendants to provide SEF

reimbursement for all outstanding expenses and otherwise allowable expenditures incurred between the date of termination and this Court's order;

      d.     Order the Defendants to rescind the February 13, 2025, Termination Letter and reinstate the federal grant for the EAC-South to the same extent and in the same manner as prior to the unlawful termination, as provided in the terms of the grant;

      e.     Award the Plaintiff costs and reasonable attorney fees; and

      f.     Grant such other relief as this Court may deem just and proper.


Dated: May 19, 2025                Respectfully submitted,


*/s/ Lucrecia P. Johnson*
Lucrecia P. Johnson, Esq.
DC Federal Bar# 1015623
LPJ Legal PLLC
853 New Jersey Ave SE, Suite 200
Washington, DC 20003
lucrecia@lpjlegal.com
(202) 643-6211

*/s/ Jamar Creech*
Jamar Creech, Esq.
Romano Law PLLC
One Battery Park Plaza, 7th Floor
New York, NY 10004
jamar@romanolaw.com
(929) 532-2580

*Counsel for Plaintiff.*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

SOUTHERN EDUCATION
FOUNDATION,

              *Plaintiff,*

     v.

UNITED STATES DEPARTMENT OF
EDUCATION, *et al.,*

              *Defendants.*

Case No. 1:25-cv-01079-PLF

## **CERTIFICATE OF SERVICE**

I, Lucrecia P. Johnson, pursuant to 28 U.S. Code § 1746, declare as follows:

1. I certify that on May 21, 2025, I electronically filed the foregoing documents and that they are available for viewing and downloading from the Court's CM/ECF system, and that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.
2. I declare under penalty of perjury that all of the statements made in this "Certificate of Service" are true and correct and that if called to testify as a witness in this matter, I could and would competently testify to each of the facts set forth in the Certificate

Respectfully submitted,

*/s/ Lucrecia P. Johnson*
Lucrecia P. Johnson, Esq.
DC Federal Bar# 1015623
LPJ Legal PLLC
853 New Jersey Ave SE, Suite 200
Washington, DC 20003
lucrecia@lpjlegal.com
(202) 643-6211

1