UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
SOUTHERN EDUCATION                                  )
FOUNDATION,                                          )
                                                    )
            Plaintiff,                               )
                                                    )
      v.                                             )        Civil Action No. 25-1079 (PLF)
                                                    )
UNITED STATES DEPARTMENT OF                          )
EDUCATION,                                           )
                                                    )
LINDA MCMAHON, UNITED STATES                         )
SECRETARY OF EDUCATION,                              )
                                                    )
and                                                  )
                                                    )
DONALD J. TRUMP,                                     )
PRESIDENT OF THE UNITED STATES                       )
OF AMERICA,                                          )
                                                    )
            Defendants.                              )
_____)


OPINION

        Since its founding in 1867 shortly after the conclusion of the Civil War, the

Southern Education Foundation, Inc. ("SEF") has worked to advance equitable education

practices and policies in the South.  From educating formerly enslaved persons after the Civil

War to advocating against the then-lawful practice of segregation in public education, SEF has

dedicated itself to fostering academic opportunity for over 150 years.  In 2022, the United States

Department of Education ("the Department") recognized SEF's work by awarding SEF a federal

grant to operate EAC-South, a technical assistance center designed to confront federal school

Case 1:25-cv-01079-PLF     Document 28     Filed 05/21/25     Page 2 of 37

desegregation cases in the South.  Since receiving the grant, SEF has invested significant time and resources into operating EAC-South.

But EAC-South's programming grinded to a halt when the Department terminated SEF's grant award on February 13, 2025.  The basis for the termination:  the Department's efforts to eliminate "[i]llegal [diversity, equity, and inclusion] policies and practices."  In view of the history of race in America and the mission of SEF since the Civil War, the audacity of terminating its grants based on "DEI" concerns is truly breathtaking.

On April 23, 2025, SEF filed a motion for a preliminary injunction, challenging the Department's decision to terminate SEF's grant and requesting immediate injunctive relief.  See Plaintiff's Motion for a Preliminary Injunction/Temporary Restraining Order ("Pl. Mot.") [Dkt. No. 11].  The Court held oral argument on SEF's motion for a preliminary injunction on May 12, 2025.  Upon careful consideration of the parties' filings, the oral arguments, and the relevant legal authorities, the Court concludes that SEF is likely to succeed on the merits of its APA claims.  The Court therefore will grant SEF's motion for a preliminary injunction.[1]

---

[1]    The Court has reviewed the following documents and attachments thereto in connection with the pending motion:  Complaint ("Compl.") [Dkt. No. 1]; Plaintiff's Motion for Preliminary Injunction/Temporary Restraining Order [Dkt. No. 11]; Plaintiff's Memorandum of Law in Support of its Motion for Preliminary Injunction/Temporary Restraining Order ("Pl. Mot.") [Dkt. No. 11-1]; Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction ("Defs. Opp.") [Dkt. No. 18]; Plaintiff's Reply In Further Support of its Motion for Preliminary Injunction ("Pl. Rep.") [Dkt. No. 19]; Plaintiff's Consent Motion to Supplement the Record ("Pl. Mot. to Suppl.") [Dkt. No. 25]; and Plaintiff's Supplemental Complaint For Declaratory and Injunctive Relief ("Am. Compl.") [Dkt. No. 26].

I.  BACKGROUND

A.  *Plaintiff*

After the Civil War ended in 1865 – and the Thirteenth, Fourteenth, and Fifteenth

Amendments were added to our Constitution – foundations were formed to train qualified

teachers, provide educational materials, and build schools for the education of formerly enslaved

persons and poor Whites in southern states.  See Am. Compl. ¶ 25.  In 1937, most of these

foundations were consolidated to form what is now the Southern Education Foundation, the

plaintiff in this case.  See id.  For over 150 years, SEF "has advanced equitable education

policies across the Southern United States, including supporting Thurgood Marshall's legal team

in Brown v. Board of Education, 347 U.S. 483 (1954)."  Pl. Mot. at 1.

B.  *The Grant Program*

To effectuate the Supreme Court's ruling in Brown v. Board of Education to

desegregate schools "with all deliberate speed," Congress enacted Title IV of the Civil Rights

Act of 1964 ("Title IV"), which directs the Department of Education to provide technical

assistance to facilitate public school desegregation initiatives.  See Am. Compl. ¶¶ 28-29; see

also 42 U.S.C. §§ 2000c et seq.  The Department established "Desegregation Assistance

Centers" ("the Centers") to "provide technical assistance in the preparation, adoption, and

implementation of plans for [the] desegregation of public schools."  Am. Compl. ¶ 29; see also

42 U.S.C. § 2000c-2; 34 C.F.R. § 270.1.  Though the Centers' work initially focused on

desegregation, see Am. Compl. ¶ 29, they later expanded to helping all students excel

academically, "regardless of race, sex, national origin, linguistic differences, cultural and social

characteristics, economic circumstances, and disability."  Id.

Case 1:25-cv-01079-PLF    Document 28    Filed 05/21/25    Page 4 of 37

In 2016, the Department renamed the Centers from "Desegregation Assistance Centers" to "Equity Assistance Centers" ("EACs") to reflect the Centers' broadened mission. Am. Compl. ¶ 30.  Today, the EAC Program is "one of the Department's longest-standing investments in technical assistance and plays a vital role in ensuring that all students have equitable access to learning opportunities . . . ."  Program History, U.S. Dep't of Educ., https://www.ed.gov/grants-and-programs/grants-birth-grade-12/training-and-advisory-services--equity-assistance-centers [https://perma.cc/NT7E-2UTV] (last visited Apr. 29, 2025).

Every year, Congress has appropriated funds under Title IV for training and technical assistance and has directed the Department to distribute those funds.  See Am. Compl. ¶ 5.  The Department of Education then obligates these grant funds through the EAC Program. See id.  Following a competitive application process, the Department awards grants to eligible entities, and the entities use the grant funds "to operate regional centers that offer technical assistance at the request of public schools."  See Defs. Opp. at 2.  After signing cooperative grant agreements with the Department, the grantees draw down (or spend) the obligated funds during a pre-approved budget period until September 30th of each budget year.  See Am. Compl. ¶ 5.

## C.  SEF's Grant and Cooperative Agreement

On February 15, 2022, the Department published a Notice Inviting Applications for the FY 2022 EAC grant competition.  See 87 F.R. 8564-8570; Am. Compl. ¶ 41.  The Notice stated that grants would be awarded for a maximum period of five years.  See 87 F.R. 8567.  The EAC competition included the following Priority:  Promoting Equity Through Diverse Partnerships.  See 87 F.R. 8566; Am. Compl. ¶ 42.  The EAC grant program's authorizing statutes set forth grant application procedures.  See 37 C.F.R. 270.

4

On May 16, 2022, SEF submitted an application for a grant to operate the EAC program for Region II, or "EAC-South." See Am. Compl. ¶ 43. EAC-South "addresses educational disparities based on race, national origin, sex, and religion" in "Alabama, Arkansas, Florida, Georgia, Louisiana, Mississippi, North Carolina, South Carolina, Tennessee, Texas, Virginia, and the District of Columbia." Pl. Mot. at 1-2. As of May 2024, the states in Region II contained 130 of the 132 open federal school desegregation cases. See id.; see also id. at Ex. 1 [Dkt. No. 11-4] at 13. In its grant application, SEF outlined a five-year plan for the grant funding and provided annual milestones it hoped to reach, one of which was the "implementation of targeted and intensive technical assistance to public schools" in the South, with a "specific focus on the active school desegregation cases in federal courts." Am. Compl. ¶ 44.

In October 2022, the Department awarded SEF a five-year discretionary grant under Title IV to operate EAC-South. See Compl. at Ex. B [Dkt. No. 1-2]; see also Am. Compl. ¶ 45; Defs. Opp. at 2. The grant totaled $8.6 million. See Defs. Opp. at 2. The grant is the "sole source of funding for EAC-South." Am. Compl. ¶ 45. The initial Grant Award Notification ("GAN") letter that SEF received from the Department contained details about the grant, budget periods, and compliance provisions. See id. at Ex. B. The GAN letter classifies SEF's grant award as "a cooperative agreement," Compl. at Ex. B; see also Defs. Opp. at 2, with the terms of the agreement set forth in a separate document. See Pl. Mot. at Ex. 1 at 31.

Since receiving the grant, "SEF, through EAC-South, has provided free services to public schools within [Region II]," including consulting with school districts to improve student equity, helping teachers foster an environment for all students to succeed, "and other services related to addressing elements of segregation in public education." Am. Compl. ¶ 47.

### D. Change of Administration and Executive Orders

On January 20, 2025, President Trump was sworn in as President of the United States. That same day, he signed Executive Order 14151, titled "Ending Radical and Wasteful Government DEI Programs and Preferencing." See Exec. Order No. 14151, Ending Radical and Wasteful Government DEI Programs and Preferencing, 90 Fed. Reg. 8339 (Jan. 20, 2025) (In order to "mak[e] America great," all DEI programs "end[] today"). Executive Order 14151 directs "[e]ach agency, department, or commission head" to, inter alia, "terminate, to the maximum extent allowed by law . . . all 'equity action plans,' 'equity' actions, initiatives, or programs, [and] 'equity-related' grants or contracts . . . .'" Id. § 2(b)(1), Implementation ("the Termination Provision") (emphasis added).

The next day, on January 21, 2025, President Trump signed Executive Order 14173, titled "Ending Illegal Discrimination and Restoring Merit-Based Opportunity." See Exec. Order No. 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, 90 Fed. Reg. 8633 (Jan. 21, 2025). Ostensibly in order to enforce "longstanding civil-rights laws and to combat illegal private-sector DEI preferences, mandates, policies, programs, and activities," § 2, Executive Order 14173 directs "all executive departments and agencies" to "terminate all discriminatory and illegal preferences, mandates, policies, programs, activities, guidance, regulations, enforcement actions, consent orders, and requirements." Exec. Order No. 14173 at § 2.

### E. February 2025 Termination of SEF's Grant

On February 13, 2025, SEF received a letter from the Department, which reads:

This letter provides notice that the United States Department of Education is terminating your federal award, S004D220011. See 2 C.F.R. § 200.340–43; see also 34 C.F.R. § 75.523.

It is a priority of the Department of Education to eliminate discrimination in all forms of education throughout the United States. The Acting Secretary of Education has determined that, per the Department's obligations to the constitutional and statutory law of the United States, this priority includes ensuring that the Department's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic. Illegal DEI policies and practices can violate both the letter and purpose of Federal civil rights law and conflict with the Department's policy of prioritizing merit, fairness, and excellence in education. In addition to complying with the civil rights laws, it is vital that the Department assess whether all grant payments are free from fraud, abuse, and duplication, as well as to assess whether current grants are in the best interests of the United States.

The grant specified above provides funding for programs that promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic; that violate either the letter or purpose of Federal civil rights law; that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; that are not free from fraud, abuse, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is therefore inconsistent with, and no longer effectuates, Department priorities. See 2 C.F.R. § 200.340(a)(4); see also 34 C.F.R. § 75.253. Therefore, pursuant to, among other authorities, 2 C.F.R. § 200.339–43, 34 C.F.R. § 75.253, and the termination provisions in your grant award, the Department hereby terminates grant No. S004D220011 in its entirety effective 2/13/25.

Compl. at Ex. D ("the Termination Letter") [Dkt. No. 1-4]. In addition to the Termination

Letter, SEF received an updated GAN letter that stated that its grant is "deemed to be

inconsistent with, and no longer effectuates, Department priorities." Compl. at Ex. E

[Dkt. No. 1-5] (citing 2 C.F.R. 200.340(a)(4) and 34 C.F.R. 75.253).

The Termination Letter set forth an informal appeal process for SEF to follow if it

"wish[ed] to object to or challenge" the termination of its grant. Compl. at Ex. D. The Letter

directed SEF to "submit information and documentation supporting [its] position in writing

within 30 calendar days of the date of this termination notice." Id. The Letter mandated that an "appeal should contain the following: 1. a copy of the written notice of termination; 2. the date you received written notice of termination; 3. a brief statement of your argument and the disputed factual, legal, or other issues; 4. the amount of funds or costs in dispute, if any; and 5. any other relevant documents." Id. Lastly, the Letter provided the name and contact information of the Department official to whom appeals should be forwarded. See id.

SEF submitted a timely appeal to the Department on or about March 10, 2025, see Am. Compl. ¶ 90, then withdrew its appeal on May 16, 2025. Id. ¶ 92. On May 14, 2025, the Department of Education remitted an electronic payment of $293,681.78 for outstanding expenses incurred by SEF on or before February 13, 2025, the date of the grant termination. Id. ¶ 93. "In spite of this payment," the EAC-South grant remains terminated. Id. As a result of the grant termination, SEF alleges that it has lost the "sole source of funding for EAC-South," id. ¶ 75, and is "currently unable to operate EAC-South." Id. ¶ 80. SEF alleges that "the loss of funding is economic harm so significant that it threatens the very existence of EAC-South." Id. ¶ 76. Specifically, SEF alleges that the termination of the grant "will result in [a] $3,371,108 overall loss," id. ¶ 88, "the loss of employment for the dedicated staff and partners who ensure EAC-South run daily," Am. Compl. ¶ 83, and "[the] loss of goodwill and injury to reputation with the school districts [SEF] service[s] through EAC-South." Id. ¶ 84.

### F.  Procedural History

On April 9, 2025, SEF filed this lawsuit against Donald J. Trump, in his official capacity as President of the United States, Linda McMahon, in her official capacity as Secretary of Education, and the Department of Education. See Am. Compl. ¶¶ 22-24. SEF claims that the Department's termination of SEF's grant violates the Administrative Procedure Act ("APA"),

see Pl. Mot. at 7-13 (Counts One, Two, and Three); the Fifth Amendment to the United States Constitution, see id. at 16-17 (Count Four); Title VI of the Civil Rights Act, see id. at 13-16 (Count Five); the First Amendment to the United States Constitution, see id. at 21-19 (Count Seven); and constitutes an ultra vires act of impoundment of congressionally approved funds. Pl. Mot. at 17-21 (Count Six). SEF seeks declaratory and injunctive relief. See Am. Compl. at 37-38. As noted, SEF filed a motion for a preliminary injunction/temporary restraining order, see Pl. Mot., and the Court held oral argument on the motion on May 12, 2025.

On May 16, 2025, SEF filed a consent motion to supplement the record pursuant to Rule 15(d) of the Federal Rules of Civil Procedure. See Consent Motion to Supplement the Record ("Pl. Mot. to Suppl.") [Dkt. No. 25]. To its motion, SEF attached a letter that it sent to the Department on May 12, 2025, formally withdrawing its administrative appeal challenging the Department's grant termination decision. Id. at Ex. A [Dkt. No. 25-1]. The Court granted SEF's motion by minute order, and gave SEF leave to serve a supplemental pleading. See Minute Order of May 16, 2025. On May 19, 2025, SEF filed an amended complaint alleging that it had withdrawn its administrative appeal before the Department. See Am. Compl. ¶ 1. SEF also advised the Court that the Department had "remitted payment of the outstanding balance of $293,681.78 for expenses incurred on or before . . . the date of the [EAC-South] grant's termination." Am. Compl. ¶ 2.

## II.    JURISDICTION

Defendants argue that this Court lacks subject matter jurisdiction for two reasons. First, they argue that because SEF seeks reinstatement of the grant agreement, its claims sound in contract and therefore belong in the Court of Federal Claims—and not this Court—under the

9

Tucker Act.  See Defs. Opp. at 6-9.  Second, they argue that because SEF administratively appealed the Department's termination decision, SEF's claims are not ripe. Id. at 9-10.

### A.  The Tucker Act

Because the "United States is immune from suit unless it unequivocally consents," Maine Cmty. Health Options v. United States, 590 U.S. 296, 322 (2020), a plaintiff requesting emergency relief against the government must "identify an unequivocal waiver of sovereign immunity."  Franklin-Mason v. Mabus, 742 F.3d 1051, 1054 (D.C. Cir. 2014).  SEF points to Section 702 of the APA as such a waiver that applies to it.  See Pl. Mot. at 18 (citing 5 U.S.C. § 702).  Indeed, the APA provides "a limited waiver of sovereign immunity" for persons "adversely affected or aggrieved by agency action."  Crowley Gov't Servs., Inc. v. Gen. Servs. Admin. ("Crowley"), 38 F.4th 1099, 1105-06 (D.C. Cir. 2022) (quoting 5 U.S.C. § 702).  But Section 702's waiver is not without limits:  For one, it only applies to claimants "seeking relief other than money damages."  5 U.S.C. § 702.  For another, "Section 702's sovereign immunity waiver does not apply [ ] 'if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.'"  Crowley, 38 F.4th at 1106 (quoting Perry Cap. LLC v. Mnuchin ("Perry Cap. LLC"), 864 F.3d 591, 618 (D.C. Cir. 2017) and 5 U.S.C. § 702).

Defendants contend that the Tucker Act "impliedly forbids" the APA's waiver of sovereign immunity in this case.  See Defs. Opp. at 6.  The Tucker Act waives the government's sovereign immunity from actions "founded . . . upon any express or implied contract with the United States."  28 U.S.C. § 1491(a)(1).  The D.C. Circuit has explained that the Tucker Act grants the Court of Federal Claims "exclusive jurisdiction over breach of contract claims against the United States seeking more than $10,000 in damages."  Crowley, 38 F.4th at 1106 (quoting Hammer v. United States, 989 F.3d 1, 2 (D.C. Cir. 2021)) (emphasis added).  So if SEF's claims

are "'at [their] essence' contractual," then they fall within the scope of the Tucker Act and this Court has no power to resolve them. Crowley, 38 F.4th at 1106 (quoting Megapulse, Inc. v. Lewis ("Megapulse"), 672 F.2d 959, 967 (D.C. Cir. 1982)); see also 5 U.S.C. § 702 (providing that the APA's waiver of sovereign immunity is inapplicable where "any other statute . . . impliedly forbids the relief which is sought.").

        The Supreme Court has cautioned, however, that "[n]ot every claim invoking the Constitution, a federal statute, or a regulation is cognizable under the Tucker Act." United States v. Mitchell, 463 U.S. 206, 216 (1983). For example, the Court of Federal Claims generally is not the appropriate forum to consider requests for injunctive relief because it "has no power to grant equitable relief." Bowen v. Massachusetts ("Bowen"), 487 U.S. 879, 905 (1988) (quoting Richardson v. Morris, 409 U.S. 464, 465 (1973) (per curiam)). The D.C. Circuit has also made clear that the Tucker Act should not be interpreted "so broad[ly] as to deny a court jurisdiction to consider a claim that is validly based on grounds other than a contractual relationship with the government." Megapulse, 672 F.2d at 968. "[T]he mere fact that a court may have to rule on a contract issue does not, by triggering some mystical metamorphosis, automatically transform an action . . . into one on the contract and deprive the court of jurisdiction it might otherwise have." Megapulse, 672 F.2d at 968 (emphasis added). Further, "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages'" such that Section 702 of the APA's waiver of sovereign immunity is inapplicable. Bowen, 487 U.S. at 893.

### B. The Essence of SEF's Claims

        To determine whether jurisdiction over this action lies with this Court or with the Court of Federal Claims, the Court must assess whether SEF's claims are "at [their] essence"

contract claims such that they fall under the Tucker Act.  Crowley, 38 F.4th at 1106 (quoting

Megapulse, 672 F.2d at 967-68).[2]  That inquiry hinges on (1) "the source of the rights upon

which [SEF] bases its claims," and (2) "the type of relief sought (or appropriate)."  Crowley, 38

F.4th at 1106 (quoting Megapulse, 672 F.2d at 968); see also Widakuswara v. Lake

("Widakuswara II"), Civil Action No. 25-5144, 2025 WL 1288817, at *3 (D.C. Cir.

May 3, 2025) (finding that Megapulse's "rights and remedies" rule also "applies to claims for

breach of grant agreements executed through binding government contracts.") (citing Columbus

Reg'l Hosp. v. United States, 990 F.3d 1330, 1338-40 (Fed. Cir. 2021)).

   The Court concludes that it has subject matter jurisdiction over this action because

SEF's claims are not "in essence" contract claims and therefore jurisdiction does not lie

exclusively in the Court of Federal Claims.  See Megapulse, 672 F.2d at 967-68; Climate United

Fund v. Citibank, N.A. ("Climate United Fund"), Civil Action No. 25-698 (TSC), 2025

WL 1131412, at *9-10 (D.D.C. Apr. 16, 2025); AIDS Vaccine Advoc. Coal. v. United States

Dep't of State ("AIDS Vaccine Advoc. Coal."), Civil Action No. 25-0400 (AHA), 2025 WL

752378, at *9 (D.D.C. Mar. 10, 2025).

   1. The "Rights and Remedies" Rule of Megapulse

   First, the source of SEF's rights.  In identifying the source of a plaintiff's rights,

courts must consider factors such as whether "the plaintiff's asserted rights and the government's

---

[2]  SEF argued—for the first time at oral argument—that the cooperative agreement
between SEF and the Department does not qualify as a "contract" for purposes of the Tucker
Act.  See Transcript of Record, Southern Education Foundation v. U.S. Department of
Education, Case No. 25-1079 (May 13, 2025) [Dkt. No. 22] at 5:8-7:3.  The Court need not
resolve that issue because, even assuming the cooperative agreement constitutes a "contract," the
Megapulse test makes clear that the cooperative agreement is not the source of the rights upon
which SEF bases its claims.

purported authority arise from statute," and "whether the plaintiff's rights exist prior to and apart from rights created under the contract." Crowley, 38 F.4th at 1107 (quoting Megapulse, 672 F.2d at 969 and Spectrum Leasing Corp. v. United States, 764 F.2d 891, 894 (D.C. Cir. 1985) (internal quotations and alterations omitted)). Defendants argue that SEF's "APA and non-APA claims are all based expressly on [SEF's] grant and cooperative agreement," and therefore the "source of the rights upon which [SEF] bases its suit is [EAC-South's] grant award and cooperative agreement (S004D220011)." Defs. Opp. at 7. The Court recognizes that SEF's claims implicate the grant agreement; indeed, SEF would have no standing to advance its claims before this Court if the Department had not terminated the grant agreement. But as noted, the "mere fact that a court may have to rule on a contract issue does not, by triggering some mystical metamorphosis, automatically transform an action . . . into one on the contract and deprive the court of jurisdiction it might otherwise have." Megapulse, 672 F.2d at 968 (emphasis added); see also Crowley, 38 F.4th at 1110 ("Granted, [plaintiff's] claim presupposes the existence of a contract, as without one the [defendant] would have no invoices to audit . . . [b]ut the right [plaintiff] seeks to vindicate is not a contract right and its action in district court only 'require[s] some reference to or incorporation of [the] contract.'" (citation omitted)).

This lawsuit is not at its essence a suit to vindicate a contractual right to grant funds or about a breach of a grant agreement's terms. Rather, SEF's claims turn entirely on examining the federal statutes and regulations governing SEF's grant award. While a grant agreement may operate as a contract, the Court need not look to the terms of the grant agreement at all to adjudicate SEF's claims. See AIDS Vaccine Advoc. Coal. at *9 ("[I]t would be quite extraordinary to consider Plaintiffs' claims to sound in breach of contract when they do not at all depend on whether the terms of particular awards were breached—they instead challenge

13

whether the agency action here was unlawful, irrespective of any breach."); see also Maryland

Dep't of Hum. Res. v. Dep't. of Health and Hum. Servs., 763 F.2d 1441, 1449 (D.C. Cir. 1985)

(concluding that though plaintiff's "claims arise under a federal grant program," they "turn on

the interpretation of statutes and regulations rather than on the interpretation of an agreement

negotiated by the parties" and therefore "are not contract claims for Tucker Act purposes.");

Climate United Fund at *10 (holding that terminated grant agreements were not the source of

grantee-plaintiffs' statutory and constitutional claims).

        Second, the type of relief SEF seeks.  SEF does not seek money damages.  SEF

requests this Court to enjoin defendants from terminating SEF's EAC-South grant award and

from "withholding any funds due to [SEF] under the grant or taking any adverse action based on

the February 13, 2025, Termination Letter."  Pl. Mot. at Proposed Order [Dkt. No. 11-7].  SEF

also asks the Court to direct defendants to "restore [SEF's] access to all grant funds."  Id.

Defendants argue that SEF "seek[s] a contractual remedy in the form of an order to essentially

pay money due under the grant and Cooperative Agreement."  Defs. Opp. at 7.  But as previously

noted, "[t]he fact that a judicial remedy may require one party to pay money to another is not a

sufficient reason to characterize the relief as 'money damages.'"  Bowen, 487 U.S. at 893; see

also Crowley, 38 F.4th at 1108 ("[E]xclusive jurisdiction in Claims Court under the Tucker Act

does not lie 'merely because [a plaintiff] hints at some interest in a monetary reward from the

federal government or because success on the merits may obligate the United States to pay the

complainant.'") (quoting Kidwell v. Dep't of Army ("Kidwell"), 56 F.3d 279, 284 (D.C.

Cir. 1995)); Kidwell, 56 F.3d at 284 ("[A] claim is not for money merely because its success

may lead to pecuniary costs for the government or benefits for the plaintiff.") (internal quotations

omitted); Vietnam Veterans v. Sec'y of the Navy, 843 F.2d 528, 534 (D.C. Cir. 1988).

Nor does SEF ask the Court to order specific performance under the grant agreement.  Rather, SEF seeks equitable relief vindicating its rights under federal statutes and the Constitution, and asks the Court to "declare [the Department's termination of the grant] unlawful and set [it] aside."  Am. Compl. at 37; see also 5 U.S.C. § 706(2) (providing that courts "shall . . . hold unlawful and set aside agency action" that violates the APA's substantive standards).  That is "precisely the relief that is afforded—indeed, required—by and routinely granted under the APA."  AIDS Vaccine Advoc. Coal., 2025 WL 752378, at *8.  Any money that flows to SEF as a result of this action "would not come from [this] court's exercise of jurisdiction, but from the structure of statutory and regulatory requirements governing compensation."  Tootle v. Sec'y of Navy, 446 F.3d 167, 175 (D.C. Cir. 2006) (citation omitted).  SEF's requested relief therefore "is not a claim for money damages, although it is a claim that would require the payment of money by the federal government."  Bowen, 487 U.S. at 894.  Because SEF's "rights and remedies" do not sound in contract, this Court—not the Court of Federal Claims—is the appropriate forum to adjudicate SEF's suit.

2.  The Case Law

To support their argument that the Court of Federal Claims has exclusive jurisdiction over this action, defendants cite two recent appellate opinions—one from the Supreme Court and one from the D.C. Circuit—that examine the Tucker Act's applicability to federal grant termination cases.  The Court addresses each in turn.

a.  Department of Education v. California

On April 4, 2025, the Supreme Court issued a per curiam opinion in Department of Education v. California ("Department of Education").  145 S. Ct. 966 (2025).  There, the

plaintiffs were grantees of the Department, see id. at 968, until they received termination letters stating that their grants had been terminated because the grants "provide[ ] funding for programs that promote or take part in [diversity, equity, and inclusion (DEI)] initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic . . . ." California v. U.S. Dep't of Education, 132 F.4th 92, 95 (1st Cir. 2025). Plaintiffs brought suit, challenging the Department's termination of their grants under the APA. See Department of Education, 145 S. Ct. at 968.

The district court entered a temporary restraining order, finding that the plaintiffs were likely to succeed on the merits of their APA claims and requiring the Department to restore the status quo as it stood prior to the terminations. See California v. U.S. Dep't of Education, Civil Action No. 25-10548 (MJJ), 2025 WL 760825, at *5 (D. Mass. Mar. 10, 2025). Specifically, the TRO enjoined the government from terminating the grants and required the government to "pay out past-due grant obligations and to continue paying obligations as they accrued" to the plaintiffs. Department of Education, 145 S. Ct. at 968. The government appealed and moved for a stay pending appeal, which was denied. See id. The government then filed an application with the Supreme Court to vacate the TRO. See id.

The Supreme Court stayed the district court's TRO. See Department of Education, 145 S. Ct. at 969. The Court found that "the APA's limited waiver of [sovereign] immunity does not extend" to the district court's injunction, which the Court construed as an "order[ ] 'to enforce a contractual obligation to pay money.'" Id. at 968 (quoting Great-West Life & Annuity Ins. Co. v. Knudson ("Great-West Life"), 534 U.S. 204, 212 (2002)). The Court acknowledged that "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds." Id. (quoting

Bowen, 487 U.S. at 910). But the Court nonetheless concluded that the district court likely "lacked jurisdiction to order the payment of money under the APA" because "the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" Id. (quoting 28 U.S.C. § 1491(a)(1)). The Court suggested that because plaintiffs' claims to continued grant payments arose from the Department's contractual obligations under the grant agreements, the suit was governed by the Tucker Act and thus belonged in the Court of Federal Claims. See id.

      The instant case is distinguishable from Department of Education. First, the plaintiffs in Department of Education brought only APA claims; they did not assert that the Department violated any other statutory provisions or infringed the United States Constitution. See California v. U.S. Dep't of Education, 2025 WL 760825, at *2. Here, SEF alleges that the Department violated the APA, the Civil Rights Act of 1964, the Impoundment Control Act of 1974, the U.S. Constitution, and various other statutes and regulations. See supra Section I.F. Second, the Supreme Court found that the plaintiffs in Department of Education would not suffer irreparable harm sufficient to preclude a stay because they had "the financial wherewithal to keep their programs running" without the grants, such that any irreparable harm "would be of their own making." Department of Education, 145 S. Ct. at 969. That is not the case here—the grant was EAC-South's "sole source of funding." Am. Compl. ¶ 45. SEF alleges that it is "currently unable to operate EAC-South," id. ¶ 80, and that the grant termination has inflicted "economic harm so significant that it threatens the very existence of EAC-South." Id. ¶ 76.

      Lastly, the Supreme Court's stay order in Department of Education does not displace governing law that guides this Court's assessment of whether SEF's claims are essentially contract claims such that jurisdiction properly lies with the Court of Federal Claims.

See Department of Education, 145 S. Ct. at 968 (citing Bowen, 487 U.S. at 910). For example, in Bowen, the Supreme Court drew a "distinction between an action at law" for money damages, which provides monetary compensation, and "an equitable action for specific relief," which might still require monetary relief. See 487 U.S. at 893; see also Great-West Life, 534 U.S. at 213 ("Whether [restitution] is legal or equitable depends on the basis for [the plaintiff's] claim and the nature of the underlying remedies sought.") (cleaned up). The Court in Bowen found that even where a district court's order likely would result in the government paying money to the plaintiff, as it would in the instant case, such payments are not necessarily "money damages," and such orders are not always "excepted from" the APA's waiver of sovereign immunity in Section 702. Bowen, 487 U.S. at 910. Rather, in such cases, the government's payment of money to the plaintiff may be "a mere by-product of [the district] court's primary function of reviewing the Secretary's interpretation of federal law." Bowen, 487 U.S. at 910 (emphasis added); see also id. at 893 ("The fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'").

            Applying Bowen's reasoning to the instant case leads to the same conclusion. While an order enjoining the Department from terminating SEF's grant would effectively require the government to keep funding the grant, that is "a mere by-product of [this] court's primary function of reviewing the Secretary's interpretation of federal law." See Bowen, 487 U.S. at 909-10. It is "not a sufficient reason to characterize [SEF's requested] relief as 'money damages'" such that the APA's waiver of sovereign immunity is inapplicable. See id. at 893.

            Defendants make no attempt to square Department of Education with Bowen, and offer no reason why the Court should disregard Bowen's teachings in favor of the Supreme Court's brief analysis in Department of Education. See Woonasquatucket River Watershed

18

Council v. U.S. Dep't of Agric., Civil Action No. 25-0097 (MSM), 2025 WL 1116157, at *15

(D.R.I. Apr. 15, 2025) (concluding that the court "cannot disregard Bowen . . . [e]ven if it looks

like [Department of Education] has 'implicitly overruled'" it.).  Absent a clear indication from

the Supreme Court that Bowen is no longer good law, the Court applies Bowen's settled

principles to conclude that SEF's suit is not necessarily a "contract dispute over money" simply

because the government would have to continue paying grant money to SEF if its requested

relief is granted.  See Cmty. Legal Servs. in E. Palo Alto v. United States Dep't of Health &

Hum. Servs., Civil Action No. 25-02847 (AMO), 2025 WL 1168898, at *3 (N.D. Cal.

Apr. 21, 2025) ("Department of Education does not represent a significant change in law.").[3]

### b.  Widakuswara v. Lake

The D.C. Circuit also recently examined the applicability of the Tucker Act in

federal grant termination cases.  In Widakuswara v. Lake, the United States Agency for

Global Media ("USAGM") terminated two of its affiliates' grant agreements for the 2025 fiscal

year.  See Widakuswara II, 2025 WL 1288817, at *1.  The grantees filed suit in this Court,

---

[3]    It is worth noting that the Supreme Court's decision in Department of Education
was made in the context of an emergency application for a stay pending appeal, with "barebones
briefing, no argument," and two pages of analysis.  See Department of Education, 145 S. Ct.
at 969 (Kagan, J., dissenting).  Its precedential value therefore is limited.  See Climate
United Fund, 2025 WL 1131412, at *9-12 (concluding that Department of Education does not
strip the court of jurisdiction over plaintiffs' grant termination claims); Rhode Island v. Trump,
Civil Action No. 25-128 (JJM), 2025 WL 1303868, at *6 (D.R.I. May 6, 2025) (concluding that
Department of Education's "precedential value is limited," and "does not render this Court an
improper forum for [plaintiffs'] claims under the APA."); Woonasquatucket River Watershed
Council v. U.S. Dep't of Agric., Civil Action No. 25-0097 (MSM), 2025 WL 1116157, at *15
(D.R.I. Apr. 15, 2025) (finding that the court retains jurisdiction over plaintiffs' APA claims
challenging the government's federal funding freeze, and Department of Education "is not to the
contrary."); Maine v. United States Dep't of Agric., Civil Action No. 25-0131 (JAW), 2025
WL 1088946, at *19 n.8 (D. Me. Apr. 11, 2025) ("The Supreme Court's April 4, 2025 decision
[in Department of Education] does not change the Court's determination that it is a proper
forum for this dispute under the APA.").

challenging the USAGM's termination of their grants, bringing claims under the APA, the United States Constitution, various congressional appropriations acts, "and numerous other statutory provisions."  Widakuswara v. Lake (Widakuswara I"), Civil Action No. 25-1015 (RCL), 2025 WL 1166400, at *5 (D.D.C. Apr. 22, 2025).  Judge Lamberth granted plaintiffs' motion for a preliminary injunction, and ordered the government to "restore the FY 2025 grants" and "disburse[ ] to [the grantees] the funds Congress appropriated."  Id. at *18.  The government appealed to the D.C. Circuit and filed a motion to stay this Court's order to restore the grantees' fiscal year 2025 grants.  See Widakuswara II, 2025 WL 1288817, at *2.

A motions panel of the D.C. Circuit granted the government's motion for a stay, finding that this Court likely lacked jurisdiction to restore the grants.  See Widakuswara II, 2025 WL 1288817, at *1, 3.  Relying on the Supreme Court's opinion in Department of Education, the panel majority found that the government, through its grant agreement with the plaintiffs, "promised to pay the appropriated funds" and "[i]n return, [plaintiffs] promised to use the funds to advance statutory objectives and to comply with all program requirements."  Id. at *3.  "These exchanges of promises—reflecting offer, acceptance, consideration, mutuality of intent, and action by an official with authority to bind the government—constitute government contracts for Tucker Act purposes."  Id. (citing Columbus Reg'l Hosp. v. United States, 990 F.3d at 1338-39).  The panel majority held that "[w]hether phrased as a declaration that [the grant] agreements remain in force, or an order to pay the money committed by those agreements," this Court's injunction "in substance order[ed] specific performance of the grant agreements—a quintessentially contractual remedy."  Id. at *4.  The panel majority concluded that the "inherently contractual nature" of the district court's relief "makes the [Court of Federal Claims] the exclusive forum for this suit."  Id.

Widakuswara II is an unpublished opinion that may not be binding on this Court.[4] And respectfully, the Court does not find the panel majority's reasoning persuasive. The panel majority held that "it is the inherently contractual nature of the relief afforded—not any characterization of the relief as money damages"—that confers jurisdiction on the Court of Federal Claims. Widakuswara II, 2025 WL 1288817, at *4. But as Judge Pillard pointed out in dissent, it is the "type of relief sought," not "the inherently contractual nature of the relief afforded" that determines whether a plaintiff's claims are "in essence" contract claims for purposes of the Tucker Act. Widakuswara II, 2025 WL 1288817, at *13 (Pillard, J., dissenting). The plaintiffs in Widakuswara II sought injunctive and declaratory relief: "No count [in their complaint] sound[ed] in contract, and none [sought] money damages for breach." Id. (Pillard, J., dissenting). And because the Court of Federal Claims is a specialized forum that can only issue "naked money judgment[s] against the United States," Bowen, 487 U.S. at 905, the injunctive relief the Widakuswara II plaintiffs sought would be unavailable to them in the Court of Federal Claims. See id. (Pillard, J., dissenting).

For these reasons, the Court declines to apply the Widakuswara II panel's reasoning to the instant case.[5]

---

[4]     D.C. Circuit Rule 32.1(b)(1)(B) provides that unpublished opinions entered on or after January 1, 2002, "may be cited as precedent," not that the Court must treat them as such. And D.C. Circuit Rule 36(e)(2) provides that, "[w]hile unpublished dispositions may be cited to the court . . . a panel's decision to issue an unpublished disposition means that the panel sees no precedential value in that disposition." Read together, these two procedural rules seem to advise litigants that they may cite unpublished opinions as precedent in their court filings, but the panel's decision not to publish the opinion "means that the panel sees no precedential value" in that opinion. Defendants offer no reason for the Court to imbibe Widakuswara II with precedential value, especially when the Circuit declined to do so itself.

[5]     On May 5, 2025, the Widakuswara II plaintiffs filed a petition for rehearing en banc. See Civil Action No. 25-5144 [Dkt. No. 2114398]. At the time of this opinion, the D.C.

*C. Ripeness*

Defendants' second jurisdictional argument is that SEF's claims are not ripe because SEF had a "pending" administrative appeal challenging the grant termination. <u>See</u> Defs. Opp. at 9-10. But on May 12, 2025, SEF withdrew its administrative appeal. <u>See</u> Pl. Mot. to Suppl. at Ex. A. SEF filed an amended complaint on May 19, 2025, to reflect that it had withdrawn its administrative appeal. <u>See</u> Am. Compl. ¶ 1. These developments resolve any risk of a concurrent administrative process that might preclude judicial review, and render defendants' ripeness argument moot. <u>See</u> <u>Scahill v. D.C.</u>, 909 F.3d 1177, 1184 (D.C. Cir. 2018) (holding that a plaintiff may cure jurisdictional defects by filing an amended pleading, thereby avoiding "the unnecessary hassle and expense of filing a new lawsuit when events subsequent to filing the original complaint have fixed the jurisdictional problem.").

Ripeness "is a justiciability doctrine" that is "'drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction.'" <u>Devia v. Nuclear Regul. Comm'n</u> ("<u>Devia</u>"), 492 F.3d 421, 424 (D.C. Cir. 2007) (quoting <u>Nat'l Park Hospitality Ass'n v. Dep't of the Interior</u>, 538 U.S. 803, 807-08 (2003)). In determining "whether the facts of a particular case meet th[e] standard of ripeness," courts apply a two-pronged analysis, evaluating (1) the fitness of the issues for judicial decision, and (2) the hardship to the parties of withholding court consideration. <u>See</u> <u>id</u>. at 424; <u>American Petroleum Institute v. EPA</u> ("<u>American Petroleum Institute</u>"), 683 F.3d 382, 387 (D.C. Cir. 2012). The first prong of ripeness—fitness of the issue for judicial decision—turns on three factors: "[1] whether [the issue] is purely legal, [2] whether consideration of the issue would benefit from a more

_____

Circuit has not yet resolved plaintiffs' petition. On May 7, 2025, the en banc D.C. Circuit administratively stayed the panel majority's stay order and the district court's injunction went back into effect. <u>See</u> <u>id</u>. Order of May 7, 2025 [Dkt. No. 2114884].

concrete setting, and [3] whether the agency's action is sufficiently final." American Petroleum Institute, 683 F.3d at 387.

> The Court finds, and the parties do not dispute, that the first and second factors under the first prong are satisfied:  The questions SEF raises—whether the Department's actions violate statutory and constitutional provisions—are purely legal inquiries.  See Atlantic States Legal Found. v. EPA, 325 F.3d 281, 284 (D.C. Cir. 2003) ("Claims that an agency's action is arbitrary and capricious or contrary to law present purely legal issues."); Beach Commc'ns, Inc. v. FCC, 959 F.2d 975, 986 (D.C. Cir. 1992) (holding that an equal protection claim presents a purely legal question).  And given the immediate harm SEF faces, see infra Section III.C, SEF's claims would not necessarily "benefit from a more concrete setting."  See American Petroleum Institute, 683 F.3d at 387.  Only the third factor under the first prong—"whether the agency's action is sufficiently final"—was contested.  In their opposition, defendants argued that this factor was not satisfied because SEF had an administrative appeal that was pending before the Department and, "a challenge to [an] appealed agency decision is not ripe."  See Defs. Opp. at 9-10.

> For the reasons discussed in Section III.C, the Court concludes that the Department's termination of SEF's grant and SEF's withdrawal of its administrative appeal satisfy the finality factor.  Therefore, all three factors of the first ripeness prong are satisfied.[6]

---

[6]    SEF argues that the second ripeness prong—hardship to the parties of withholding court consideration—weighs heavily in their favor.  See Pl. Rep. at 4.  Defendants do not contest this point.  The Court finds that the direct and immediate harms alleged by SEF are sufficient to outweigh the institutional interest in the deferral of judicial review.  See Am. Petroleum Inst. v. EPA, 683 at 389 (finding that in order to outweigh the "institutional interest[ ] in the deferral of [judicial] review, any hardship caused by that deferral must be immediate and significant." (internal quotations and citation omitted)).  With both ripeness prongs satisfied, the Court concludes that SEF's claims are ripe for judicial review.

### III.    SEF'S REQUEST FOR A PRELIMINARY INJUNCTION

*A. Legal Standard*

SEF seeks a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure.  A movant seeking preliminary injunctive relief must make a "clear showing that four factors, taken together, warrant relief:  likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest."  Archdiocese of Washington v. Wash. Metro. Area Transit Auth. ("Archdiocese of Washington"), 897 F.3d 314, 321 (D.C. Cir. 2018) (quoting League of Women Voters v. Newby 838 F.3d 1, 6 (D.C. Cir. 2016)); see also Sherley v. Sebelius, 644 F.3d 388, 392 (D.C. Cir. 2011) (noting that a preliminary injunction "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." (quoting Winter v. Nat. Res. Def. Council, Inc. ("Winter"), 555 U.S. 7, 22 (2008))).  Of these, the most important factor is whether the movant has established a likelihood of success on the merits.  See Aamer v. Obama, 742 F.3d 1023, 1038 (D.C. Cir. 2014); see also Bailey v. Fed. Bureau of Prisons, Civil Action No. 24-1219 (PLF), 2024 WL 3219207, at *3 (D.D.C. June 28, 2024).

Before the Supreme Court's decision in Winter, courts in this Circuit weighed these four factors on a "sliding scale," under which the movant need not "make as strong a showing" on one factor if they "make[ ] an unusually strong showing" on another.  Davis v. Pension Benefit Guar. Corp., 571 F.3d 1288, 1291-92 (D.C. Cir. 2009) (quoting Davenport v. Int'l Bhd. of Teamsters, 166 F.3d 356, 361 (D.C. Cir. 1999)); accord Damus v. Nielsen, 313 F. Supp. 3d 317, 326 (D.D.C. 2018).  This Circuit has suggested, however, that "a likelihood of success" and "a likelihood of irreparable harm" are "independent, free-standing requirement[s] for a preliminary injunction."  Sherley v. Sebelius, 644 F.3d at 392-93 (quoting Davis v. Pension

Benefit Guar. Corp., 571 F.3d at 1296 (Kavanaugh, J., concurring)); see Archdiocese of

Washington, 897 F.3d at 334 (declining to resolve whether the "sliding scale" approach is still

valid after Winter); Nat'l Treasury Emps. Union v. Vought, Civil Action No. 25-0381

(ABJ), 2025 WL 942772, at *19 (D.D.C. Mar. 28, 2025).  Regardless, "a failure to show a

likelihood of success on the merits alone is sufficient to defeat a preliminary-injunction motion."

Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs, 205 F. Supp. 3d 4, 26 (D.D.C. 2016)

(citing Ark. Dairy Coop. Ass'n v. U.S. Dep't of Agric., 573 F.3d 815, 832 (D.C. Cir. 2009));

see also M.G.U. v. Nielsen, 325 F. Supp. 3d 111, 117-18 (D.D.C. 2018).

      For each of its claims, SEF bears the burden of persuasion.  Chaplaincy of Full

Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006).  SEF also "bears the burden of

producing credible evidence sufficient to demonstrate [its] entitlement to injunctive relief."

Workman v. Bissessar, 275 F. Supp. 3d 263, 267 (D.D.C. 2017).

### B.  Irreparable Harm

      When considering a motion for preliminary injunction, courts typically begin their

analyses by determining the movant's likelihood of success on the merits.  See Archdiocese of

Washington, 897 F.3d at 321.  In this case, however, the Court turns first to irreparable harm.

      In Brown v. Board of Education, 347 U.S. 483 (1954), the Supreme Court

declared racial segregation in public education unconstitutional, and mandated its elimination

"with all deliberate speed."  Brown v. Bd. of Educ. of Topeka, Kan. ("Brown II"), 349

U.S. 294, 301 (1955).  Today, 70 years later, there are still 132 open federal school desegregation

cases.  Pl. Mot. at Ex. 1 at 13.  An overwhelming 130 of those cases are concentrated in states

located in the South.  Id.  In line with Brown's constitutional mandate, SEF—through the

EAC-South program—has worked tirelessly to "confront the high concentration of unresolved

federal school desegregation cases in the Southern region," and deliver "targeted support to public schools still struggling with the lingering effects of segregation that continue to limit educational opportunity for students."  Am. Compl. ¶ 11.  At the time the Department terminated the EAC-South grant, EAC-South was "actively working with several school districts, including districts under active federal desegregation orders."  Declaration of Eshé P. Collins ("Collins Decl.") [Dkt. No. 11-2] ¶¶ 6.  For example, EAC-South was assisting Fayette County Public Schools ("FCPS")—a school district that has remained under a federal desegregation order since 1965—with "ongoing desegregation initiatives" such as ensuring compliance with court-ordered monitoring and reporting requirements.  Declaration of Dr. Tameka D. Lewis [Dkt. No. 11-6] ¶¶ 5, 11.  The Department's termination of the EAC-South grant, has left "[s]everal districts . . . without the technical assistance they had requested and have come to rely on as part of their civil rights compliance efforts."  Collins Decl. ¶ 12.

        The Department's decision contravenes the very principle of "deliberate speed" mandated by Brown II.  "Brown never contemplated that the concept of 'deliberate speed' would countenance indefinite delay in elimination of racial barriers in schools."  Watson v. City of Memphis, 373 U.S. 526, 529-30 (1963).  Nor did President Eisenhower and the courageous judges in the South who interpreted Brown.  They could hardly have imagined that some future Presidential Administration would hinder efforts by organizations like SEF—based on some misguided understanding of "diversity, equity, and inclusion"—to fulfill Brown's constitutional promise to students across the country to eradicate the practice of racial segregation.

        Turning to the particular harms that SEF alleges it will suffer absent immediate injunctive relief:  First, SEF alleges that "[t]he Department's abrupt termination of SEF's EAC grant has caused immediate and severe financial and operational harm."  Pl. Mot. at 29.

26

Specifically, "[t]he termination has deprived SEF of the sole source of funding for EAC-South," has "result[ed] in an immediate cessation of program operations and services," and "will result in a $1,924,031.96 annual loss to SEF, including outstanding payments of $293,681.78 for the current EAC-South program." Id.; see also Am. Compl. ¶ 88. SEF also alleges that "the termination of the grant will result in $3,371,108 overall loss, including the remaining two budget periods of a year each." Pl. Mot. at 29. In addition to monetary losses, SEF alleges that the termination of SEF's EAC-South grant "has forced SEF to shut down EAC-South entirely," resulting in "the loss of experienced staff [and] interrupt[ing] ongoing technical assistance projects." Pl. Mot. at 29. SEF contends that these financial and operational harms are an "existential threat to what SEF has built." Id.

Second, SEF alleges that the termination of its EAC grant "has inflicted serious and irreparable damage to SEF's reputation and crucial relationships built over decades." Pl. Mot. at 30. According to SEF, the "sudden disruption" of EAC-South's programming "jeopardizes SEF's credibility" with the school districts that it serves because the districts "can no longer depend on [SEF] to provide consistent, federally authorized assistance." Id. And "[i]f school districts cannot rely on SEF to help them comply with desegregation orders, they may be less likely to engage with [SEF] on other educational equity initiatives." Id.[7]

Defendants respond that SEF has not proffered any evidence that its "estimated economic loss would be unrecoverable," and that SEF "operates several programs," of which EAC-South is just one. Defs. Opp. at 11. According to defendants, "loss of experienced

---

[7]    SEF also alleges that "[t]he termination of the EAC-South grant inflicts severe and irreparable harm on the educational agencies and students that SEF serves," and that "the harm done to SEF's free speech rights is automatically irreparable." Pl. Mot. at 30, 32. Because the Court finds that SEF's first two arguments are sufficient to demonstrate irreparable harm, the Court need not reach these arguments.

[EAC-South] staff, interrupted ongoing technical assistance projects," and other harms to EAC-South "say[ ] nothing about the degree of harm to [SEF], which is what is relevant." Id. Defendants also argue that the reputational harms alleged by SEF do not "logically follow" when, as SEF believes, "the termination was unrelated to any deficiency in [SEF's] performance under the grant." Id. at 12. Finally, defendants argue that SEF's "assertion of irreparable harm is belied by the time it took [SEF] to seek preliminary injunctive relief," noting that SEF filed its motion sixty-nine days after its grant was terminated. Id. at 13.

The Court disagrees with the defendants. When a program's "existence relies on grant money, harm is certain once the grant funds are withdrawn." Climate United Fund, 2025 WL 1131412, at *17. As a result of the termination of the EAC-South grant, "SEF was forced to halt all EAC-South operations, suspend services to multiple school districts, and reassign staff." Collins Decl. ¶ 12. The abrupt loss of funding has "directly impaired SEF's ability to fulfill its obligations under . . . current service requests by [school] districts and state agencies," id. ¶ 14, and to otherwise "fulfill its mission." Am. Compl. ¶ 80. SEF now is unable to provide assistance to "school districts seeking to resolve federal desegregation orders." Id. Without immediate relief, SEF asserts that it "stands to lose specialized employees whose expertise cannot be easily replaced, and with them, the institutional knowledge essential to [EAC-South's] work." Pl. Rep. at 7.

To constitute irreparable harm, SEF's alleged injury must be "both certain and great," "actual and not theoretical," and "beyond remediation." Brennan Ctr. for Just. at NYU Sch. of L. v. Dep't of Com., 498 F. Supp. 3d 87, 101 (D.D.C. 2020) (quoting Chaplaincy of Full Gospel Churches, 454 F.3d at 297). While economic injuries are usually insufficient to justify injunctive relief, financial harm can "constitute irreparable harm . . . where the loss threatens the

very existence of the movant's business." Wis. Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985). And "obstacles [that] unquestionably make it more difficult for the [plaintiff] to accomplish [its] primary mission . . . provide injury for purposes . . . [of establishing] irreparable harm." League of Women Voters v. Newby, 838 F.3d at 9. Reputational injury can also suffice to establish irreparable harm. See Patriot, Inc. v. U.S. Dep't of Hous. & Urb. Dev., 963 F. Supp. 1, 5 (D.D.C. 1997) (finding plaintiffs' business reputation would be damaged by [agency's] characterization of them as "enticing" senior citizens into meetings, and "pressuring" them to obtain reverse mortgages "under the guise of sound estate planning.").

The Court finds that SEF has sufficiently demonstrated that it will suffer irreparable harm because the defendants' actions threaten the livelihoods of SEF's employees, its professional reputation, and the very existence of its programs. See Am. Ass'n of Colleges, 2025 WL 833917, at *23 (finding that federal grant recipients whose grants were terminated would suffer irreparable harm absent an injunction); Climate United Fund, 2025 WL 1131412, at *17 (same).

### C. Likelihood of Success on the Merits

SEF contends that it is likely to succeed on the merits of all of its claims: its APA claims (Counts One, Two, and Three), Fifth Amendment claim (Count Four), Civil Rights Act claim (Count Five), Ultra Vires claim (Count Six), and First Amendment claim (Count Seven). The Court concludes that SEF is likely to succeed on the merits of Count One—that the

Department's termination of the EAC-South grant was arbitrary and capricious.  The Court therefore will grant SEF's motion for a preliminary injunction.[8]

### 1.  Finality

The APA limits judicial review to "final agency action."  5 U.S.C. § 704.  Agency action is "final" when two conditions are met: (1) "the action must mark the 'consummation' of the agency's decision making process—it must not be of a merely tentative or interlocutory nature," and (2) "the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'"  Bennett v. Spear, 520 U.S. 154, 177-78 (1997) (quoting Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp., 333 U.S. 103, 113 (1948), and Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatl., 400 U.S. 62, 71 (1970)).  Here, the "final" agency action that SEF challenges is the Department's termination of the EAC-South grant.

The Termination Letter represented that the Department had concluded its review of the EAC-South grant.  See Compl. at Ex. D. at 1 ("the Department hereby terminates grant No. S004D220011 in its entirety effective 2/13/25.").  The termination "was immediate, without prior notice of deficiencies or opportunity to respond."  Pl. Mot. at 2.  The Termination Letter immediately produced legal consequences for SEF because SEF could no longer access previously awarded funds.  See Am. Ass'n of Colleges"), Civil Action No. 25-0702 (JRR), 2025 WL 833917, at *12 (finding the Department's termination of other education-related grants

---

[8]    Although the parties briefed multiple issues, the Court need only find that SEF is likely to succeed on one of its claims for this factor to weigh in their favor.  The Court therefore does not address all SEF's arguments.  See Media Matters for Am. v. Paxton, 732 F. Supp. 3d 1, 27 (D.D.C. 2024), appeal dismissed, Civil Action No. 24-7059, 2025 WL 492257 (D.C. Cir. Feb. 13, 2025).

"immediately produced legal consequences."); <u>see also</u> <u>Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget</u>, 2025 WL 368852, at *10 (finding Office of Management and Budget memorandum directing federal agencies to temporarily pause disbursement of federal financial assistance and to freeze all such funds "immediately produced legal consequences across the entire federal funding system").

But, perhaps most relevant, on May 12, 2025, SEF withdrew its administrative appeal.  <u>See</u> Pl. Mot. to Suppl. at Ex. A.  Then, on May 19, 2025, SEF filed an amended complaint to reflect that it had withdrawn its administrative appeal.  <u>See</u> Am. Compl. ¶ 1.  These factual developments resolve any risk of a concurrent administrative process altering the Court's analysis or obviating judicial review.  <u>See</u> <u>Vanda Pharms. Inc. v. Food & Drug Admin.</u>, Civil Action No. 23 2812 (CRC), 2024 WL 4133623, at *8 (D.D.C. Sept. 10, 2024) (emphasizing that what "matters" when determining whether a claim is incurably premature is if a "separate, still pending [administrative] proceeding . . . might alter the court's analysis or entirely vitiate the need for judicial review." (quoting <u>Flat Wireless, LLC v. FCC</u>, 944 F.3d 927, 933 (D.C. Cir. 2019)); <u>see</u> <u>also</u> <u>Scahill v. D.C.</u>, 909 F.3d 1177, 1184 (D.C. Cir. 2018) (explaining that permitting a plaintiff to cure jurisdictional defects through amended pleadings avoids "the unnecessary hassle and expense of filing a new lawsuit when events subsequent to filing the original complaint have fixed the jurisdictional problem.").  The Court is satisfied that the purpose of the incurably premature doctrine—to prevent wasteful parallel proceedings—is no longer implicated here.  The Court concludes that the Department's termination of the EAC-South grant constituted final agency action.

2.  Arbitrary and Capricious

SEF likely will prevail in showing that the Department's termination of the
EAC-South grant was arbitrary and capricious.  The APA instructs reviewing courts to hold
unlawful and set aside final agency actions found to be "arbitrary, capricious, an abuse of
discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2).  When assessing
whether a final agency action is "arbitrary, capricious, an abuse of discretion, or otherwise not in
accordance with law," courts consider "only whether the [agency] examined 'the relevant data'
and articulated 'a satisfactory explanation' for [its] decision, 'including a rational connection
between the facts found and the choice made.'"  Dep't of Commerce v. New York, 588
U.S. 752, 773 (2019) (quoting Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm
Mut. Automobile Ins. Co. ("Motor Vehicle Mfrs. Assn."), 463 U.S. 29, 43 (1983)); see also
FCC v. Prometheus Radio Project, 592 U.S. 414, 423 (2021) (explaining that an agency action is
"arbitrary" and "capricious" if it is not "reasonable and reasonably explained."); Nat'l Tel. Coop.
Ass'n v. FCC, 563 F.3d 536, 540 (D.C. Cir. 2009) ("The APA's arbitrary-and-capricious
standard requires that agency rules be reasonable and reasonably explained.").  "The scope of
review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its
judgment for that of the agency." Motor Vehicle Mfrs. Assn., 463 U.S. at 43.

In determining whether the Department's termination of the EAC-South grant was
"reasonable and reasonably explained," the Court looks first to the "grounds that the
[Department] invoked" when it terminated the grant.  Michigan v. EPA, 576
U.S. 743, 758 (2015)); see also Motor Vehicle Mfrs. Assn., 463 U.S. at 50 (". . . an agency's
action must be upheld, if at all, on the basis articulated by the agency itself.").  The Termination
Letter lists five theoretical bases for the grant termination, stating that SEF's grant may have

been terminated because it "promote[s] or take[s] part in DEI initiatives," or "unlawfully discriminate[s] on the basis of" protected characteristics, or "violate[s] either the letter or purpose of Federal civil rights law," or "conflict[s] with" the Department's policies, or "[is] not free from fraud, abuse, or duplication," or "otherwise fail[s] to serve the best interests of the United States."  Compl. at Ex. D at 2.  The Termination Letter does not identify which of these bases was the reason for the termination of SEF's grant; in fact, the Termination Letter was one of many standardized letters that the Department sent out to several education-related grant recipients.  See California v. U.S. Dep't of Educ., Civil Action No. 25-10548 (MJJ), 2025 WL 760825, *2-3 (D. Mass. Mar. 10, 2025); Am. Ass'n of Colleges for Tchr. Educ. v. McMahon, Civil Action No. 25-0702 (JRR), 2025 WL 833917, at *17 (D. Md. Mar. 17, 2025).

As noted, the Supreme Court has held that a reasonable explanation must consider relevant data and articulate a satisfactory explanation for the agency's decision, "including a rational connection between the facts found and the choice made."  Dep't of Commerce v. New York, 588 U.S. at 773 (quoting Motor Vehicle Mfrs. Assn., 463 U.S. at 43).  Here, "[t]he Department has not provided a satisfactory explanation of the facts found or the choice made, much less a rational connection between the two."  Am. Ass'n of Colleges for Tchr. Educ. v. McMahon, 2025 WL 833917, at *21.  There is no evidence in the record that the Department engaged in any individualized assessment of EAC-South's programming or collected or considered any relevant data about EAC-South before terminating the grant.  And the Department's use of a boilerplate letter that was issued to several other grant recipients further strengthens SEF's argument that there was no rational connection between the facts the Department found, if any, and the termination decision that it made.  See Am. Ass'n of Colleges for Tchr. Educ. v. McMahon, 2025 WL 833917, at *21 (finding that an identical termination

letter "fail[ed] to provide Grant Recipients any workable, sensible, or meaningful reason or basis for the termination of their awards.").

The Court finds that the Department's Termination Letter provides no reasoned explanation for the grant termination. In fact, the Termination Letter's list of possible bases "is so broad and vague as to be limitless; devoid of import, even." Am. Ass'n of Colleges for Tchr. Educ. v. McMahon, 2025 WL 833917, at *21. For these reasons, the Court finds that SEF has shown a substantial likelihood of success on the merits of Count One. [9]

*D. Equities and the Public Interest*

The remaining preliminary injunction factors—the balance of the equities and assessment of the public interest—weigh in SEF's favor. These factors "merge when, as here, the Government is the opposing party.'" Singh v. Berger, 56 F.4th 88, 107 (D.C. Cir. 2022) (quoting Karem v. Trump, 960 F.3d 656, 668 (D.C. Cir. 2020)). "[C]ourts must balance the competing claims of injury and must consider the effect on each party of the granting or

---

[9]    The arbitrary and capricious nature of the Department's termination decision is further illustrated by the Termination Letter's "appeal process." Despite providing no reasonable basis for terminating the EAC-South grant, the Termination Letter nonetheless states that if SEF "wish[es] to object or challenge [the Department's] termination decision, [SEF] must submit information and documentation supporting [its] position," including "a brief statement of [its] argument and the disputed factual, legal, or other issues." Compl. at Ex. D at 1. But absent an explanation of what exactly it did wrong, how could SEF have mounted a meaningful administrative appeal? See Am. Ass'n of Colleges, 2025 WL 833917, at *21 (faced with an identical termination letter, the court questioned: "[h]ow does one draft a 'brief statement' of a 'disputed' fact when one has no earthly idea what has been asserted, if anything?").

withholding of the requested relief[,] . . . pay[ing] particular regard for the public consequences" that would result in granting the relief sought. <u>Winter</u>, 555 U.S. at 24 (quotation marks omitted).

SEF has alleged economic and non-economic injuries that would occur absent immediate relief, and assert that an injunction would merely require the Department "to honor its existing legal obligations until the Court can properly review the merits of this case." Pl. Mot. at 32. SEF notes that "the Department has already appropriated and obligated funds for [EAC-South] through the current fiscal year, meaning no additional financial burden would be imposed on the government." <u>Id</u>. Defendants counter that the Department would be "harmed by a preliminary order to release remaining funds under the terminated grant" because it would "bear all the risk if the Court enters a preliminary injunction." Defs. Opp. at 22. Defendants also assert that public interest favors allowing the Department to end support for programs that are "inconsistent with its interpretation of 'the letter and purpose of'" civil rights laws. <u>Id</u>. at 21.

Defendants' arguments miss the mark. Under <u>Winter</u>, the Court must balance harms that may occur if an injunction is erroneously granted as opposed to denied. <u>See</u> <u>Winter</u>, 555 U.S. at 24. Defendants assert that they bear the risk of financial loss if the Court erroneously enters a preliminary injunction, but offer no evidence that SEF is unable to pay back grant monies released. As for defendants' public interest argument, any theoretical harms to members of the public who are opposed to EAC-South receiving grant funding do not outweigh the alleged concrete, irreparable harm in the form of programmatic closures and loss of funding that SEF has already experienced. And to the extent defendants assert an interest in ending financial support for programs that are "inconsistent" with their interpretation of federal civil rights laws, the Court finds that that they likely pursued an unlawful objective in an unlawful manner. <u>See</u> <u>TikTok Inc. v. Trump</u>, 490 F. Supp. 3d 73, 85 (D.D.C. 2020) ("[T]he government

'cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required.'") (quoting <u>R.I.L-R v. Johnson</u>, 80 F. Supp. 3d 164, 191 (D.D.C. 2015)); <u>see also</u> <u>League of Women Voters v. Newby</u>, 838 F.3d at 12 (holding that while "[t]here is generally no public interest in the perpetuation of unlawful agency action," "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operation'") (quoting <u>Washington v. Reno</u>, 35 F.3d 1093, 1103 (6th Cir. 1994)).

The Court therefore concludes that the balance of the equities and assessment of the public interest weigh in favor of granting a preliminary injunction. Each of the preliminary injunction factors therefore weighs in favor of granting SEF's motion.

## IV. SECURITY

Rule 65(c) of the Federal Rules of Civil Procedure provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the Court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." FED. R. CIV. P. 65(c). Here, defendants request that the Court require SEF "to post security in the amount of any taxpayer funds anticipated to be distributed during the pendency of the Court's order." Defs. Opp. at 22.

Courts have "broad discretion" in determining "the appropriate amount of an injunction bond, including the discretion to require no bond at all." <u>Simms v. D.C.</u>, 872 F. Supp. 2d 90, 107 (D.D.C. 2012) (internal citation and quotation marks omitted). As the Court explained in <u>Nat'l Treasury Emps. Union v. Trump</u>, requiring a significant bond "would conflict with both the Court's findings that each of the preliminary injunction factors weigh heavily in [SEF's] favor and the principles of the right to seek judicial review of unlawful government action." <u>Nat'l Treasury Emps. Union v. Trump</u>, —— F.Supp.3d at ——, 2025 WL 1218044,

at *21. The Court, in its discretion, orders SEF to post a bond in the amount of $100 pursuant to Rule 65(c) of the Federal Rules of Civil Procedure.

V. CONCLUSION

For the foregoing reasons, SEF's Motion for a Preliminary Injunction/Temporary Restraining Order [Dkt. No. 11] is hereby GRANTED.

An Order consistent with this Opinion will issue this same day.

SO ORDERED.

PAUL L. FRIEDMAN
United States District Judge

DATE: 5/21/25